BENEFIEL v AUTO-OWNERS INSURANCE COMPANY

Docket No. 273664. Submitted December 11, 2007, at Lansing. Decided December 27, 2007, at 9:00 a.m. Leave to appeal sought.

Robert E. Benefiel brought an action against Auto-Owners Insurance Company in the Livingston Circuit Court to recover underinsured motorist benefits for noneconomic damages under the no-fault insurance act, MCL 500.3135(1), for injuries he claimed to have sustained in the second of two vehicular accidents that occurred within one year. The court, David J. Reader, J., granted the defendant's motion for summary disposition after ruling that there was no evidence that the course of the plaintiff's life had been affected by the second accident. The plaintiff appealed.

The Court of Appeals *held*:

1. The trial court erred by ruling that the injuries that the plaintiff sustained in the second accident did not affect his general ability to lead his normal life. Because there is no evidence to suggest that the plaintiff suffered injuries in the first accident that resulted in a catastrophic, permanent, residual impairment that was physically incapable of healing, such as a severed limb, a proper analysis of the second accident's effect on the plaintiff's whole life to determine his normal pre-accident lifestyle should not be limited to the period after the first accident.

2. An analysis of the plaintiff's medical records, work history, and recreational activities indicates that the course of the plaintiff's normal life was affected by the injuries he sustained in the second accident. The second accident left the plaintiff with spinal injuries that required risky surgical intervention and left him with lost mobility, pain, and numbness, which impaired his ability to work, drive, and sleep.

3. If the trial court concludes on remand that causation is a question of fact for the jury, the jury will be charged with determining which accident caused which injuries. If the jury is incapable of making this determination, the trial court could conclude, assuming it is shown that the underinsured motorist negligently caused the accident that resulted in the plaintiff's injuries, that the defendant is responsible for all the injuries and damages that the plaintiff sustained.

Reversed and remanded for further proceedings.

INSURANCE — NO-FAULT — SERIOUS IMPAIRMENT OF BODY FUNCTION — MULTIPLE
    ACCIDENTS.

When determining whether a plaintiff who was involved in a
    previous automobile accident has suffered a serious impairment of
    body function from the accident at issue, a proper analysis of the
    second accident's effect on the plaintiff's whole life should not be
    limited to the period after the first accident in cases where the first
    accident did not result in a catastrophic, permanent, residual
    impairment that was physically incapable of healing (MCL
    500.3135[1]).

*Donald E. Lewis* and *Sarah J. Lewis* for the plaintiff.

*Conlin, McKenney & Philbrick, P.C.* (by *William M.
Sweet* and *Donald A. Winningham*), for the defendant.

Before: DONOFRIO, P.J., and SAWYER and CAVANAGH, JJ.

DONOFRIO, P.J. Plaintiff appeals as of right the order
granting defendant's motion for summary disposition
under MCR 2.116(C)(10) in this action brought under
the no-fault act, MCL 500.3101 *et seq.*, to recover
damages for injuries that plaintiff suffered in an auto-
mobile accident that plaintiff claims resulted in a seri-
ous impairment of body function. Because the trial
court erred by finding that plaintiff's injuries did not
affect his general ability to lead his normal life, we
reverse and remand.

I

Plaintiff was involved in two separate automobile
accidents within one year. The first accident occurred
on February 13, 2002, and the second occurred on
February 8, 2003. This action arises out of injuries
plaintiff claimed he sustained in the second automobile
accident, in which a vehicle driven by an underinsured

motorist struck plaintiff's vehicle. When the second accident occurred, plaintiff had an insurance policy with defendant that included a provision for underinsured motorist benefits. Plaintiff instituted this action against defendant to recover benefits for injuries he claimed he suffered to his left shoulder and neck in the second automobile accident.[1] Defendant moved for summary disposition pursuant to MCR 2.116(C)(10), arguing that plaintiff did not sustain a serious impairment of an important body function that affected his general ability to lead a normal life in the second accident. The trial court granted defendant's motion, stating that "nothing indicate[d] that th[e] course or trajectory of his life ha[d] been affected by the second accident." This appeal followed.

II

A trial court's decision on a motion for summary disposition is reviewed de novo. *Collins v Comerica Bank*, 468 Mich 628, 631; 664 NW2d 713 (2003). A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. *Corley v Detroit Bd of Ed*, 470 Mich 274, 278; 681 NW2d 342 (2004). Summary disposition should be granted under MCR 2.116(C)(10) if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Babula v Robertson*, 212 Mich App 45, 48; 536 NW2d 834 (1995). A genuine issue of material fact exists when, giving the benefit of reasonable doubt to the opposing party, the record leaves open an issue on which reasonable minds could differ. *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

---

[1] Each of the individual motorists causing the two accidents settled plaintiff's claims against them through their insurers and with defendant's consent.

III

Under the no-fault automobile insurance act, MCL 500.3101 *et seq.*, liability for noneconomic losses is limited to instances in which the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement. MCL 500.3135(1); *Hardy v Oakland Co*, 461 Mich 561, 565; 607 NW2d 718 (2000); *Williams v Medukas*, 266 Mich App 505, 507; 702 NW2d 667 (2005). A serious impairment of body function is "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." MCL 500.3135(7); *Kreiner v Fischer*, 471 Mich 109, 129; 683 NW2d 611 (2004).

A

To help determine whether a plaintiff has met the statutory threshold, the *Kreiner* Court developed a multistep process to assist a trial court in determining whether a plaintiff has suffered a threshold injury. *Kreiner, supra* at 131. "First, a court must determine that there is no factual dispute concerning the nature and extent of the person's injuries; or if there is a factual dispute, that it is not material to the determination whether the person has suffered a serious impairment of body function." *Id.* at 131-132. If a court so concludes, as the trial court did here, it may continue to the next step. *Id.* at 132. "Second, if a court can decide the issue as a matter of law, it must next determine if an 'important body function' of the plaintiff has been impaired." *Id.* Third, if the court finds that an important body function has been impaired, the court must next determine if the impairment is objectively manifested. *Id.* An objectively manifested impairment is a " 'medically identifiable injury or condition that has a

physical basis.' " *Jackson v Nelson*, 252 Mich App 643, 653; 654 NW2d 604 (2002), quoting SJI2d 36.11. Fourth, if the court "finds that an important body function has been impaired, and that the impairment is objectively manifested, it then must determine if the impairment affects the plaintiff's general ability to lead his or her normal life." *Kreiner, supra* at 132. Finally, "[i]n determining whether the course of the plaintiff's normal life has been affected, a court should engage in a multifaceted inquiry, comparing the plaintiff's life before and after the accident as well as the significance of any affected aspects on the course of the plaintiff's overall life." *Id.* at 132-133. Then "the court must engage in an objective analysis regarding whether any difference between the plaintiff's pre- and post-accident lifestyle has actually affected the plaintiff's 'general ability' to conduct the course of his life." *Id.* at 133.

The actual extent of the injuries caused by the second accident is difficult—if not impossible—to separate from plaintiff's earlier injuries as a result of the first accident. But defendant states in its brief on appeal that it does not challenge the existence of an objectively manifested injury that can be traced to the second accident for purposes of the summary disposition motion and this appeal. And since we consider the evidence in the light most favorable to the party opposing the motion, *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999), we assume that plaintiff's injuries, conditions, and impairments are attributable to the second accident. Accordingly, plaintiff has shown that his impairment associated with his spinal injury constitutes an impairment of an important body function that was objectively manifested given his medical documentation that he suffered from a disc herniation and disc degeneration that ultimately required a multilevel discectomy and fusion surgery. See *Shaw v Martin*, 155

Mich App 89, 96; 399 NW2d 450 (1986) (stating that the movement of one's back is an important body function). Thus, we assume for purposes of this appeal that plaintiff has established the first three steps of the multistep process of establishing a threshold injury. *Kreiner, supra* at 131-133.

B

The remaining issue is whether the injury affected plaintiff's general ability to lead his normal life. *Kreiner, supra* at 136. In engaging in this analysis, one of the primary disputes between the parties concerns what time frame to consider for purposes of comparing plaintiff's normal lifestyles before and after the second accident. Plaintiff contends that the proper inquiry involves focusing not on the time between the first and second accident, but rather on the 55 years of living that he did before the second accident. In particular, plaintiff states that, contrary to defendant's contention, plaintiff's neck and shoulder pain worsened after the second accident, and the fact that plaintiff underwent a cervical discectomy and fusion following the second accident is evidence that the second accident significantly affected his general ability to lead his normal life. Defendant asserts that we should consider plaintiff's life immediately before the second accident as compared to his life immediately after the second accident. It is defendant's position that plaintiff's life after the second accident was not appreciably different from his life following the first accident. Defendant specifically argues that plaintiff's testimony clearly demonstrates that he was already disabled as a result of the first accident and that his ability to lead his normal life after the first accident had not been affected as a result of the second accident.

Regarding comparing a plaintiff's pre- and post-injury lifestyle, the *Kreiner* Court counseled:

> In determining whether the course of the plaintiff's normal life has been affected, a court should engage in a multifaceted inquiry, comparing the plaintiff's life before and after the accident as well as the significance of any affected aspects on the course of the plaintiff's overall life. Once this is identified, the [trier of fact] must engage in an objective analysis regarding whether any difference between the plaintiff's pre- and post-accident lifestyle has actually affected the plaintiff's "general ability" to conduct the course of his life. Merely "any effect" on the plaintiff's life is insufficient because a de minimis effect would not, as objectively viewed, affect the plaintiff's "general ability" to lead his life. [*Kreiner, supra* at 132-133 (emphasis omitted).]

Contrary to the position defendant advances, *Kreiner* does not provide a temporal directive limiting our inquiry to a review of plaintiff's life immediately before the second accident as compared to his life immediately after the second accident. *Kreiner, supra* at 132-133. But, at the same time, *Kreiner* does not suggest that we consider the entire span of plaintiff's life before the second accident in our analysis. *Id.* Rather, the *Kreiner* Court provided the following guidance:

> [W]e do not require that "every aspect of a person's life must be affected in order to satisfy the tort threshold . . . ." Rather, in a quite distinct proposition, we merely require that the *whole* life be *considered* in determining what satisfies this threshold, i.e., whether an impairment "affects the person's general ability to lead his or her normal life." [*Id.* at 133 n 16 (emphasis added and in original and internal citation omitted).]

Thus, we must engage in a fact-intensive inquiry regarding what constituted plaintiff's "whole life" at the time of the second accident in order to determine whether the second accident affected the course of

plaintiff's "normal life." In other words, our analysis of plaintiff's lifestyles before and after the second automobile accident lifestyle necessarily requires us to consider plaintiff's injuries, functional deficiencies, and activity limitations existing before the second automobile accident because they may have a direct effect on what constitutes plaintiff's "normal life." By the same token, however, when faced with a multiple-accident situation as we have here, plaintiff's "normal life" may not have been significantly affected by prior injuries separate from the later accident.

By way of example, consider a hypothetical plaintiff who sustained an injury in an automobile accident that is plainly capable of healing, such as a simple fracture of a leg. While the plaintiff's broken leg is in the process of healing, he sustains exacerbating injuries to the leg in a second automobile accident. Review of the plaintiff's "whole life" in order to determine whether the second accident affected the course of his "normal life" should not be limited to the time frame following the initial injury because the plaintiff lost the opportunity for his leg to recover completely and experience no residual impairment that would affect his functional abilities and life activities once he completely heals. In this scenario, "whole life" should be understood as encompassing a time frame sufficient to determine the state of the plaintiff's "normal" life before sustaining the first injury and should not include the limitations associated with those injuries because those are not the plaintiff's usual or "normal" limitations.

At the other end of the spectrum, however, consider a second hypothetical plaintiff whose lifestyle was exceptionally physical and mobile before an automobile accident caused an injury that is not capable of complete recovery, such as a severed leg. Sometime later, the

plaintiff sustains injuries in a second automobile accident. Unlike the previous example, review of the plaintiff's "whole life" in order to determine whether the second accident affected the course of his "normal life" will necessarily concern the time frame following the initial injury where he lost his leg because, due to the permanency and completeness of the first injury, the plaintiff lost no opportunity for full recovery. This hypothetical plaintiff's "normal" lifestyle before the initial accident would have been severely altered as a result of an injury such as the loss of a leg. More specifically, the plaintiff's "normal life" must encompass the time frame after sustaining the initial injury and would include only those functional abilities and activities that he was capable of performing after losing his leg.[2]

Here, it is undisputed that plaintiff was involved in the first automobile accident on February 13, 2002, after which he suffered neck, back, and shoulder problems. Plaintiff testified that within a couple weeks of the first accident in 2002, he began experiencing soreness in his neck. In May 2002, after plaintiff's neck locked up and while experiencing tremendous pain, he visited a chiropractor, Dr. Giulio Cogo. Dr. Cogo took x-rays and then manipulated plaintiff's spine until approximately August 2002. Plaintiff stated that Dr. Cogo put him on ultralight duty, meaning that he should not lift anything heavier than a folder. Sometime after May 2002, plaintiff began experiencing pain in his shoulders and a burning sensation under his left shoulder blade. In August 2002, plaintiff began spinal ma-

---

[2] This hypothetical situation is not exhaustive and does not consider a permanently injured person suffering additional injuries that may be catastrophic or otherwise sufficiently serious to constitute a serious impairment of body function.

nipulation treatments with his physician, John Rosella, M.D. Plaintiff stated that Dr. Rosella also performed injections to stimulate soft-tissue repair. Dr. Rosella also placed plaintiff on ultralight duty. In November 2002, Dr. Rosella prescribed physical therapy for plaintiff's spine, neck, and left shoulder. In December 2002, plaintiff reported improvement, but continued to complain of occasional soreness in his neck and left upper trapezius coupled with fatigue in his left shoulder. Plaintiff stated that physical therapy improved his pain but that he still experienced a burning sensation that made it difficult to fall asleep. While continuing with physical therapy for the first accident, plaintiff was involved in the second automobile accident in February 2003. Following the second accident, plaintiff continued physical therapy for his neck, back, and shoulder problems until April 14, 2003. He then began his course of medical, surgical, and physical rehabilitation.

Our review of the record reveals that, like most injuries, the injuries plaintiff sustained as a result of the first accident fall somewhere on the continuum between the injuries presented in the above examples. Unlike a severed leg, plaintiff's initial injury is not a permanent injury that is physically incapable of healing. But it is also unlike a simple fracture of a leg that is likely to heal completely and leave no residual impairment. The record indicates that plaintiff sought treatment for the injuries he sustained in the first accident and was actively participating in a course of treatment designed to heal those injuries and relieve his residual pain and other limitations.

Record evidence suggests that the second accident imposed a medical regime on plaintiff that made completing the course of treatment from the first accident, as well as full recovery from the injuries sustained in

the first accident, physically impossible. In other words, as a direct result of the second accident, plaintiff lost all opportunity to completely heal and become pain-free after the first accident without being burdened by further complications or any additional conditions he sustained due to the second accident. While it is impossible to know whether plaintiff would have suffered any residual impairment from his neck, back, and shoulder injuries sustained in the first accident had he had the opportunity to complete a full treatment program, we have found no evidence in the record suggesting that the injuries he sustained in the first accident resulted in a catastrophic, permanent, residual impairment physically incapable of healing. Therefore, for summary disposition purposes, and in the light most favorable to plaintiff, we conclude that review of plaintiff's "whole life" in order to determine plaintiff's "normal" lifestyle before the second accident should not be limited to the time frame following the first accident.

C

The next step in the analysis is to determine whether the injuries plaintiff sustained in the second accident affected his general ability to lead his normal life without limiting the relevant time frame to that time following the first accident. *Kreiner, supra* at 136. The *Kreiner* Court enunciated five nonexclusive, nonexhaustive objective factors to assist in evaluating whether an impairment has affected a plaintiff's "general ability" to lead or conduct the course of his or her normal life: "(a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment, (d) the extent of any residual impairment, and (e) the prognosis for eventual recovery." *Kreiner, supra* at 133. The five factors are not

intended to be individually dispositive, but rather are intended to serve as a framework for considering the totality of the circumstances to determine whether the plaintiff's impairments affect his or her general ability to conduct the course of his or her normal life. *Id.* at 133-134.

The *Kreiner* Court further explained that the "serious impairment of body function" inquiry must "proceed[ ] on a case-by-case basis because the statute requires inherently fact-specific and circumstantial determinations."[3] *Kreiner, supra* at 134 n 19 (internal quotation omitted). Hence, in analyzing all five of the objective factors in order to evaluate whether an impairment has affected a plaintiff's "general ability" to lead or conduct the course of his or her normal life, a trial court must engage in a dynamic inquiry. This exercise requires the trial court to examine the record evidence and then balance, compare, and contrast all the objective factors.[4] While balancing the factors, a trial court may choose to assign more weight to one

---

[3] The *Kreiner* Court noted that the Legislature rejected the *DiFranco* standard in favor of the *Cassidy* standard. *Kreiner, supra* at 121 n 8; MCL 500.3135(7); *DiFranco v Pickard,* 427 Mich 32; 398 NW2d 896 (1986); *Cassidy v McGovern,* 415 Mich 483; 330 NW2d 22 (1982). The Court in *Cassidy* concluded that two broken bones in the lower right leg constituted a serious impairment of body function as a matter of law. *Cassidy, supra* at 505-506 ("We hold that his two broken bones, 18 days of hospitalization, 7 months of wearing casts during which dizzy spells further affected his mobility, and at least a minor residual effect one and one-half years later are sufficiently serious to meet the threshold requirement of serious impairment of body function.").

[4] It is incumbent on plaintiffs' learned counsel to provide the necessary records, documentation, and evidence in support of claims brought, together with the analysis of the *Kreiner* factors when responding to serious impairment of body function motions for summary disposition. While it is incumbent on the trial court to engage in the *Kreiner* balancing inquiry, it is not incumbent on the trial court to search out support for its analysis.

factor than another factor depending on the circumstances of a particular case. Our Supreme Court illustrated this in the following example:

> Whether an impairment that precludes a person from throwing a ninety-five miles-an-hour fastball is a "serious impairment of body function" may depend on whether the person is a professional baseball player or an accountant who likes to play catch with his son every once in a while. [*Id.*]

Further, the *Kreiner* Court counseled that the fact "that the duration of the impairment is short does not necessarily preclude a finding of a 'serious impairment of body function.' On the other hand, that the duration of the impairment is long does not necessarily mandate a finding of a 'serious impairment of body function.' " *Id.* at 134. In the same vein, the more extensive the nature and degree of the impairment, the lesser the need for a lengthy or permanent duration of impairment in order to qualify an impairment as a serious impairment of body function.

In this case, the analysis requires an in-depth scrutiny of plaintiff's (1) medical records, (2) work history, and (3) recreational activities as they are contained in the record. According to plaintiff, after the accident, his neck pain and left shoulder pain became worse. Plaintiff continued with physical therapy until April 14, 2003, and also continued treatment with Dr. Rosella. Several months after the second accident, plaintiff reported that his pain worsened and "began to radiate down his left upper extremity, over the radial forearm down to the thumb and first finger associated with numbness in the same distribution and weakness in the left upper extremity."

In September 2003, Dr. Rosella referred plaintiff for a magnetic resonance imaging (MRI) and thereafter he was referred to a neurosurgeon, Stephen Boodin, M.D.

According to a letter from Dr. Boodin, the MRI showed that plaintiff suffered a significant disk herniation at C-6-7 on the left and significant degenerative disc disease and spurring at C-5-6, which was worse on the left than on the right. Dr. Boodin's examination revealed somewhat limited motion in plaintiff's neck, weakness of the left triceps, weakness of the left external rotators of the left arm, and markedly diminished left brachioradialis reflex and left triceps reflex. After reviewing the MRI and examining plaintiff, Dr. Boodin reported that

> it is my impression that this patient does have a significant and symptomatic disc herniation at C-6-7 and significant and symptomatic degenerative disc disease at C-5-6 on the left subsequent to the second automobile accident of February, 2003.

Dr. Boodin suggested that plaintiff "seriously consider surgical intervention," specifically, "anterior discectomy and fusion at C-5-6 and C-6-7." Dr. Boodin explained to plaintiff and his wife that the suggested surgery had risks of complications, including paralysis.

On October 24, 2003, Dr. Boodin performed the discectomy and fusion surgery at C-5-6 and C-6-7. Dr. Boodin's operative report reveals that the surgery involved removing disk material, drilling holes in the disk space, inserting bone plugs into the drilled holes, and securing a 47.5 mm plate to the C-5 and C-7 vertebral bodies permanently with four 13-mm set screws. Plaintiff tolerated the surgery well and, as of October 27, 2003, office reports show that his wound was healing well. Dr. Boodin reported that x-rays taken shortly after the operation showed the "plate to be in good position and fusions to be developing nicely." Plaintiff wore a hard neck brace for several weeks after the surgery and then a soft collar.

Plaintiff stated that following his surgery he experienced radiating pain while sneezing or coughing from the point of the incision radiating into his left shoulder. On December 8, 2003, Dr. Boodin noted that plaintiff was experiencing "some muscle spasm in the trapezius" and had plaintiff start exercises as part of the treatment program. According to a January 5, 2004, report from Dr. Boodin, plaintiff had been doing his exercises, and although plaintiff reported "a little bit of pain in the neck, especially when he turns to the right," he "seems to be doing quite well." The report also indicated that Dr. Boodin advised plaintiff to continue to increase his activities and thought that plaintiff would probably be allowed to return to work by February 3, 2004. According to a January 26, 2004, report from Dr. Boodin, plaintiff was still experiencing "slight pain turning to the left and pain and weakness in the left trapezius." Dr. Boodin's examination revealed "decreased reflex in the left biceps" but was otherwise normal. Dr. Boodin advised plaintiff to resume his normal activities and continue his exercises. Dr. Boodin expected plaintiff's problems to "disappear" but directed him to return in six weeks if he was still having problems. According to plaintiff, he was prescribed pain medication and muscle relaxants through February 2004.

Plaintiff returned to see Dr. Boodin on March 8, 2004, complaining of "pain somewhat in the left side of the neck and somewhat toward the left shoulder and in the left trapezius with some burning." Dr. Boodin also noted that plaintiff still had "some limitation of motion of the cervical spine but no muscle spasm." Dr. Boodin prescribed plaintiff Bextra for pain and ordered an MRI to determine his further course of action. On March 15, 2004, Dr. Boodin reported that plaintiff's MRI "did not show anything of consequence" except for a "fairly

large joint at C-5-6 on the left which may be part of his problem." Dr. Boodin prescribed plaintiff a course of physical therapy.

An initial evaluation from Maines & Dean Physical Therapy dated April 15, 2004, indicated that plaintiff was suffering from tenderness and range-of-motion deficits in the cervical region, restricted joint mobility in the left scapula, strength deficits affecting his upper left side, and tightness in his upper body. Plaintiff was unable to perform housework or deskwork and unable to use his arms above shoulder level. Thereafter, plaintiff began a physical therapy regimen designed to decrease his pain and frequency of headaches, increase tone in the cervical region, and improve strength in the left shoulder.

Plaintiff visited Dr. Boodin on May 17, 2004. Dr. Boodin stated that plaintiff "definitely improved on the therapy" and continued the therapy for one more month. On June 21, 2004, Dr. Boodin reported that plaintiff's neck was "somewhat limited in motion, especially to the left" and that plaintiff "continues to have mild discomfort over the brachioradialis when he puts his head in certain positions or when he is doing something with his left arm." Dr. Boodin continued plaintiff's physical therapy for another month. On August 16, 2004, plaintiff returned to Dr. Boodin, who reported that plaintiff was "still having a problem, primarily with a trigger point over the medial border of the left scapula" and "decreased sensation over the first finger on the left." At the request of Maines & Dean, Dr. Boodin continued plaintiff's physical therapy and kept plaintiff's restrictions in force for another month. According to plaintiff, Dr. Boodin placed him on a light-duty work restriction that allowed him to lift only up to ten pounds.

At a deposition dated August 24, 2004, plaintiff stated that he had experienced constant pain and burning in his neck and upper shoulder, especially under his left shoulder blade; that he did not take medication for pain; and that he was unable to do a number of things that he used to do. According to plaintiff, as he became fatigued during the course of the day, the pain reached his left bicep and the burning intensified. During the course of his physical therapy, plaintiff had gotten stronger but still lacked endurance. He experienced headaches at the end of the day as well, and, according to plaintiff, Dr. Boodin and his physical therapist had treated him with massage and several techniques to alleviate the headaches. Plaintiff stated that before the first accident, he was diagnosed with migraine headaches, but he described the current headaches as qualitatively different. Plaintiff also complained of a loss of sensation in his left index fingertip that occurred after the second accident and had continued since the surgery.

According to a September 15, 2004, Maines & Dean physical therapy progress report, plaintiff had completed 43 physical therapy sessions between April 15, 2004, and September 15, 2004. As of September 15, 2004, Maines & Dean reported that plaintiff's condition had improved, but that he continued to experience a burning sensation in his left shoulder and scapula when fatigued and reported an episode of increased pain, tingling, and numbness that radiated from his left upper extremity to his thumb and finger after shutting the tailgate on his truck. At that time, plaintiff reported difficulty carrying anything greater than eight pounds, difficulty turning his head to the left, and difficulty with overhead activity. As assessed, plaintiff's cervical range of motion measurably worsened and the then functional limitations were "moderate" and his rehabilitation potential was only "fair."

The last medical progress note contained in the record was dated September 20, 2004, when Dr. Boodin reported that plaintiff continued to experience pain, had some limitation of motion to the left, and still had "decreased sensation to the pin in C-6 on the left." Dr. Boodin also opined that plaintiff had "a little stretch in the nerve root." Dr. Boodin prescribed physical therapy for another month. According to plaintiff's June 28, 2006, deposition, Dr. Boodin had released plaintiff from his care.

Regarding plaintiff's employment experience, plaintiff stated that he began working as the director of sales and operations for Lynn's Cleaning, a business he and his wife owned and operated in 2000. In addition to his tasks as director, in July 2000, plaintiff began cleaning for 15 hours a week, which included emptying trash, dusting, vacuuming, and cleaning and washing floors. Just before the first accident in February 2002, plaintiff worked between 25 to 32 hours a week for Lynn's Cleaning. After that accident, plaintiff could no longer perform physical tasks, only administrative tasks. Plaintiff reported that as of November 22, 2002, he was on a very-light-duty work restriction with Lynn's Cleaning, which meant that he was prohibited from lifting anything heavier than a folder.

Plaintiff began providing contract delivery services for a company named Master Air in either January or February 2002. Plaintiff picked up film to be processed and dropped off the processed film to certain pharmacies and retail outlets on a regular route. Plaintiff stated that in May 2002, after the first accident, he paid his nephews to work his route because he could not meet a lifting requirement of 35 pounds. Plaintiff intended to return to working the route; however, when plaintiff could no longer find a suitable individual to

work the route in his stead, a few months after the second accident, Master Air ended his employment.

From January 2003 through May 2003, plaintiff worked as the part-time operations manager of Brighton Cleaning Supplies, where his duties included managing day-to-day operations. From late April 2003 to May 2003, plaintiff did some consulting work for Brighton Tool & Die, Inc., that required him to visit the company periodically. Plaintiff stated that on June 10, 2003, he left Brighton Cleaning Supplies for a more lucrative position and began working three days a week as co-general manager at Brighton Tool & Die. He was responsible for day-to-day operations, including scheduling, ordering, production, purchasing, shipping, and quality control. Plaintiff's employment ended at Brighton Tool & Die in September 2005 for economic reasons. In September 2005, Lynn's Cleaning was outbid on a number of its contracts and plaintiff and his wife relocated to northern Michigan. In April 2006, plaintiff began working 40 hours a week as a seasonal maintenance employee for the Mackinaw Historic Parks at Mill Creek. Plaintiff's duties included cleaning restrooms, lawn mowing,[5] trimming, and occasionally running a gas-powered log splitter.

Regarding recreational activities, during the August 24, 2004, deposition, plaintiff stated that before the first accident, he golfed once or twice a week, water-skied three or four times a year, rode horseback a couple times a year, and rode a bicycle a couple times a year. Plaintiff stated that he was unable to play golf, water ski, ride a horse, or bicycle after the first accident and had not been able to return to those activities following

___

[5] Plaintiff reported that he mows lawns with an ergonomic push mower about 10 to 12 percent of the time, and the remainder of the time he uses a riding lawn mower.

the second accident. At his second deposition, in July 2005, plaintiff stated that he had attempted to ride a bicycle, which caused him to be "laid up" until January 2006. As of June 28, 2006, plaintiff hoped to try playing golf again and hoped to try riding a particular bicycle that would provide more stability for his back.

After thoroughly reviewing the record and engaging in the multifaceted inquiry in which we applied the nonexhaustive list of objective factors outlined in *Kreiner, supra* at 133, we conclude that the course of plaintiff's normal life has been affected by the injuries he sustained in the second automobile accident. The medical records alone reveal that both the "nature and extent of the impairment" and "the type and length of treatment required" was extensive and extremely serious. *Id.* It was Dr. Boodin's diagnosis that plaintiff had a "significant and symptomatic disc herniation at C-6-7 and significant and symptomatic degenerative disc disease at C-5-6 on the left subsequent to the second automobile accident of February, 2003." The severity of plaintiff's condition necessitated surgical intervention, namely anterior discectomy and fusion at C-5-6 and C-6-7. The procedure was complicated, had many risks including paralysis, required extensive rehabilitation, and resulted in permanent and progressive residual abnormal conditions. The point of the surgery was to relieve plaintiff's symptoms by fusing together vertebrae in his neck. It necessarily follows that plaintiff no longer has the ability to move his neck in a normal manner and has lost range of motion because his vertebrae are now permanently fused together by bony growth, a metal plate, and screws in his spine. The record also reflects that following the surgery, plaintiff still experienced pain in his neck, shoulder, arm, and spine that necessitated another MRI, limitation of activities, wearing neck braces, pain medication, regular

doctor visits, and an extended course of physical therapy. In fact, the record reveals that plaintiff had appointments with his surgeon, Dr. Boodin, nearly every four to six weeks for the year following the surgery and endured a course of at least 43 physical therapy sessions between April 15, 2004, and September 15, 2004.

Regarding "the duration of the impairment," "the extent of any residual impairment," and "the prognosis for eventual recovery," *Kreiner, supra* at 133, because plaintiff's injuries required him to undergo an anterior discectomy and fusion at C-5-6 and C-6-7, by definition, portions of plaintiff's spine are now fused together for the rest of his life. Thus, plaintiff has a lifelong impairment of lost mobility and range of motion in that area of his spine. Plainly, the record is replete with documented pain and numbness affecting plaintiff's neck, shoulder, and his left arm both before the surgery and even years after the surgery. Over time, plaintiff's symptoms have progressed to the point where plaintiff experiences numbness radiating from his spine, down his arm, and to fingers in his left hand. Plaintiff aggressively attempted to alleviate his pain and regain his mobility by regularly following up with his surgeon, attending multiple rounds of physical therapy, performing exercise at home, taking medication, and limiting his activities. However, despite plaintiff's comprehensive medical treatment program, nearly a year after surgery, plaintiff was still impaired by residual pain and numbness, and his assessed functional limitations were "moderate" while his rehabilitation potential was only "fair."

When applying the *Kreiner* framework to the totality of the circumstances in this case, we also consider plaintiff's work situation and recreational activities. It is clear from the record that plaintiff did not lead a

limited or sedentary life before becoming impaired. Plaintiff worked more than one job at a time and the jobs required physical labor. Plaintiff was completely unable to work for three months after the surgery and then had doctor-imposed restrictions on his duties for months after the surgery. After plaintiff was able to return to work, he was still physically unable to perform many of the physical tasks he performed before he was injured. Also, while plaintiff became unable to meet the job requirements for his Master Air job after the first accident, it was the injuries and length of the impairment he suffered as a result of the second accident that precluded him from returning to that job. Moreover, after plaintiff lost mobility in his neck, and pain and numbness affected his shoulder, back, arm, and hand, it became increasingly difficult for plaintiff to perform tasks at the family cleaning business, do work around the house, and participate in recreational activities that he participated in before the accident. More basic activities were also affected from time to time, such as plaintiff's ability to drive and sleep. He also experienced headaches.

The record shows that plaintiff has been able to return to work and is able to perform certain job-related physical tasks. Plaintiff has also made attempts to return to the recreational activities he enjoyed before the accidents, but with only minor success. We acknowledge that many of plaintiff's current restrictions are self-imposed, and self-imposed restrictions, based on real or perceived pain, are insufficient to establish impairment. *Kreiner, supra* at 133 n 17. But consideration of these self-imposed restrictions are but one factor in a much more comprehensive analysis of the totality of the circumstances involving all five factors of the *Kreiner* framework. *Id.* at 133. Not one factor of the *Kreiner* factors is the quintessential factor. The activi-

ties plaintiff states he can no longer engage in are limitations that logically track the objective manifestations of his injuries and resultant impairment, and serve to bolster our analysis of the other factors. After reviewing the whole record in this case, we determine that the injuries plaintiff sustained, together with the surgery required, lengthy treatment program, and likelihood of residual pain and functional limitation, necessarily have affected and will continue to affect the course or trajectory of plaintiff's life. Therefore, when viewing the record in the light most favorable to plaintiff, we conclude that the trial court erred by finding that plaintiff's injury did not affect his general ability to lead his normal life. *Kreiner, supra* at 136.

D

Given the nature of the facts of this case, causation will be at issue on remand because defendant did not challenge the existence of an objectively manifested injury that can be traced to the second accident for purposes of the summary disposition motion and this appeal only. On remand, the trial court may conclude that causation is a question of fact for the jury. If so, the jury will be charged with determining which injuries were caused by each accident. However, given the likely difficulty in differentiating, it is conceivable that a jury may be incapable of doing so. If that were to occur— that is, if plaintiff showed that the underinsured motorist negligently caused an accident resulting in injury but the jury could not separate accident-related and non-accident-related injuries and damages—the trial court could conclude that the injury would be indivisible and defendant would therefore be deemed responsible for all the injuries and damages that plaintiff sustained. See *Belue v Uniroyal, Inc*, 114 Mich App 589,

594-595; 319 NW2d 369 (1982) (discussing the policy of "holding a tortfeasor responsible for 100% of a plaintiff's damages where a defendant's tort causes an aggravation of a plaintiff's previous injury and the jury is unable to apportion the damages between the tortfeasor and the previous cause"); *Richman v City of Berkley*, 84 Mich App 258, 260-264; 269 NW2d 555 (1978) (concluding that the trial court erred by failing to instruct the jury that if it became impossible to apportion accident-related injuries and damages from non-accident-related injuries and damages, the defendant is deemed to be responsible for all such injuries and damages); M Civ J I 50.11.[6]

IV

In conclusion, for purposes of summary disposition, the circumstances of this case require a review of plaintiff's "whole life" in order to determine what constituted plaintiff's "normal" lifestyle before the second accident, and the review is not limited to the time frame following the first accident. After engaging in this review, we conclude that the trial court erred by finding that plaintiff's injury did not affect his general ability to lead his normal life. The trial court's focus was far too

---

[6] M Civ J I 50.11 instructs in pertinent part:

If an injury suffered by plaintiff is a combined product of both a preexisting [disease/injury/state of health] and the effects of defendant's negligent conduct, it is your duty to determine and award damages caused by defendant's conduct alone. You must separate the damages caused by defendant's conduct from the condition which was preexisting if it is possible to do so.

However, if after careful consideration, you are unable to separate the damages caused by defendant's conduct from those which were preexisting, then the entire amount of plaintiff's damages must be assessed against the defendant.

narrow, both temporally and by its near exclusion of analysis of the *Kreiner* factors, when evaluating the course or trajectory of plaintiff's life. *Kreiner, supra* at 133-134. We conclude that the correct application of the *Kreiner* factors establishes that plaintiff has met his burden in establishing that he suffered a serious impairment of body function.

Reversed and remanded to circuit court for trial. We do not retain jurisdiction.