McNEEL v FARM BUREAU GENERAL INSURANCE COMPANY
OF MICHIGAN

Docket No. 285008. Submitted September 9, 2009, at Grand Rapids.
Decided June 29, 2010, at 9:05 a.m.

Kathleen McNeel, individually, and Wakelin McNeel, as trustee of
the Kathleen McNeel Revocable Living Trust, brought an action in
the Mecosta Circuit Court on October 5, 2004, against Farm
Bureau General Insurance Company of Michigan, the insurer of a
house purchased by Kathleen and transferred to the trust that was
destroyed by fire on March 18, 2003. Defendant had investigated
the loss and had determined that the loss was not covered under
the policy's increase-in-hazard provision, which provided that
defendant was not liable for losses occurring while the building "is
vacant beyond a period of sixty consecutive days or is unoccupied
beyond a period of six consecutive months." Defendant claimed
that "nobody had lived in the house as a domicile since November
2001." Between April 2003 and October 14, 2003, a series of letters
were exchanged and at least one meeting occurred between the
parties. In April 2003, defendant denied coverage. That denial was
withdrawn in a May 22, 2003, letter. A second formal denial was
communicated in a June 26, 2003, letter. Following further com-
munication, defendant indicated on October 14, 2003, that it
would continue its denial. Defendant moved for summary disposi-
tion on the basis that plaintiffs had failed to file their claim within
one year of the date that the claim was denied as required by the
policy and MCL 500.2833(1)(q). The court, Ronald C. Nichols, J.,
denied the motion, noting that there was a factual dispute with
regard to when the formal denial occurred. At the trial, defendant
abandoned the issue of when the formal denial occurred, present-
ing no evidence on the issue and making no request that the jury
determine the issue. The jury returned a verdict for plaintiffs,
concluding that the house had not been vacant at least 60
consecutive days before the loss and that it had been occupied at
least six consecutive months before the date of the fire. The court
issued a judgment for plaintiffs on the verdict. Plaintiffs moved for
case-evaluation sanctions, interest, and costs. The court deter-
mined that defendant's denial was reasonable, but also concluded
that the decision in *Griswold Props, LLC v Lexington Ins Co*, 276

Mich App 551 (2007), applied retroactively. Under *Griswold*, a first-party insured is entitled to 12 percent penalty interest if a claim is not timely paid, irrespective of whether the claim is reasonably in dispute. Therefore, the court, in an amended opinion and order, awarded 12 percent interest on $54,500 of the $69,500 judgment on the verdict retroactively beginning on July 13, 2003, which was 60 days after the proof of loss was filed, with the remainder of the award subject to interest accrued from the date of the complaint. The court also granted plaintiffs attorney fees for 43 hours at $150 an hour. Defendant appealed and plaintiffs cross-appealed.

The Court of Appeals *held*:

1. Defendant waived its affirmative statute-of-limitations defense at trial by not seeking a jury finding regarding when the formal denial occurred and by failing to present any evidence at trial that the denial occurred anytime other than on October 14, 2003. This waiver, however, did not waive defendant's right to appeal the denial of its motion for summary disposition. Although defendant waived any complaint of error on the issue at trial, defendant could still argue on appeal that the trial should not have occurred because the trial court improperly denied summary disposition on the issue. Therefore, a proper issue on appeal was whether the trial court correctly held that there was an outstanding question of fact material to the determination of when the formal denial that stopped the tolling under MCL 500.2833(1)(q) occurred.

2. The trial court did not err by determining that there was a question of fact regarding when the formal denial occurred. The court considered an affidavit of plaintiffs' representative stating that, in a meeting on October 10, 2003, defendant's representative indicated that he would consider the claim in light of documents to be submitted and would only make a decision about whether the claim would be denied after he had done so. Although it is reasonable to construe defendant's representative's subsequent letter on October 14, 2003, and his affidavit in response to the affidavit of plaintiffs' representative as evidence of an unbroken denial since June 2003, the affidavit of plaintiffs' representative created an inference that defendant again withdrew its formal denial while it reinvestigated the claim and sent a subsequent denial on October 14, 2003. The trial court properly left it up to the jury to determine whether defendant's representative made the comments attributed to him in the affidavit of plaintiffs' representative and whether those comments constituted a withdrawal of defendant's previous formal denial that was followed by a new formal denial.

3. The trial court's jury instruction regarding the definition of the term "unoccupied," which was not defined in the policy, was proper. While a dictionary defines "occupy" as "to live in," "unoccupied" as "[n]ot occupied," and "vacant" as "[h]olding nothing: empty," the definitions together indicate that "unoccupied" means "not lived in." The instruction properly informed the jury that it had to determine whether the house had not been lived in for more than six consecutive months.

4. Because (1) the *Griswold* Court retroactively applied its decision to the three consolidated cases before it and at least one subsequent panel of the Court of Appeals determined the decision to be retroactive, (2) the law that was overturned in *Griswold* cannot be considered clear and uncontradicted, and (3) the factors for prospective-only application set forth in *Paul v Wayne Co Dept of Pub Serv*, 271 Mich App 617, 621 (2006), weigh in favor of retroactive application, the trial court properly concluded that *Griswold* applied retroactively to this case.

5. The record did not support the trial court's determination that plaintiffs' counsel overbilled his hours by 46 percent. Therefore, the court's reduction based on that calculation was erroneous. Plaintiffs' counsel's billing records were legally sufficient, his testimony supported his claims of the time spent, and no contrary evidence was presented. The trial court abused its discretion in its determination of reasonable attorney fees. The part of the judgment that awarded attorney fees must be reversed and the matter must be remanded for a new award of attorney fees.

Affirmed in part, reversed in part, and remanded.

K. F. KELLY, J., dissenting, stated that there was no question of material fact that defendant formally denied plaintiffs' claim on June 26, 2003. Under the plain and unambiguous language of MCL 500.2833(1)(q), an insured must bring his or her claim within one year after the insurer formally denies liability. The trial court erred by denying defendant's motion for summary disposition because there was no dispute on the record that plaintiffs' claim had been formally denied in June 2003 and plaintiffs did not file their complaint until well after June 2004. The affidavit by plaintiffs' representative did not create a question of fact regarding when defendant formally denied plaintiffs' claim. The parties' further discussions and plaintiffs' submissions of additional information and requests to reconsider the denial did not operate to rescind defendant's June 26, 2003, formal denial. The majority wrongly invoked the doctrine of judicial tolling, which the Supreme Court has explicitly rejected. The judgment and order of the trial court should be reversed.

INSURANCE — PENALTY INTEREST — OPINIONS BY APPELLATE COURTS — RETROAC-
    TIVE APPLICATION OF OPINIONS.

   The decision in *Griswold Props, LLC v Lexington Ins Co*, 276 Mich
   App 551 (2007), which held that a first-party insured is entitled to
   12 percent penalty interest if a claim is not timely paid, irrespec-
   tive of whether the claim is reasonably in dispute, applies retro-
   actively.

   *Fabian, Sklar & King, P.C.* (by *Douglas G. McCray*)
(*Donald M. Fulkerson*, of counsel), for plaintiffs.

   *Hopkins, Yeager & Smith, P.C.* (by *Scott E. Pederson*
and *E. Frederick Davison*), for defendant.

   Before: M. J. KELLY, P.J., and K. F. KELLY and SHAPIRO,
JJ.

   SHAPIRO, J. This insurance-coverage dispute stems
from a fire on March 18, 2003, that completely de-
stroyed a farmhouse owned by the Kathleen McNeel
Revocable Living Trust (the Trust). Defendant appeals
as of right the trial court's order granting plaintiffs the
$69,500 jury award, interest of $37,259.78 pursuant to
MCL 500.2006, and case-evaluation sanctions of
$19,818.34, and plaintiffs cross-appeal. We affirm the
part of the judgment based on the jury's verdict, but
reverse the part of the judgment regarding attorney
fees and remand for entry of an order consistent with
this opinion.

### I. BACKGROUND AND PROCEEDINGS

   The property at issue, located at 10981 W. River
Road, Remus, Michigan (the Bundy farmhouse), was
purchased by Kathleen McNeel in the 1970s and trans-
ferred to the Trust in 1993. Defendant issued an
insurance policy to Kathleen McNeel, with the Trust as
an additional insured, covering three dwellings and

their contents, including the Bundy farmhouse, which policy was in effect when the Bundy farmhouse was destroyed by arson[1] on March 18, 2003. Defendant investigated the loss and determined that the loss was not covered under the policy because "nobody had lived in the house as a domicile since November 2001." Under the "Increase in Hazard" provision, the policy provided that defendant was not liable for losses occurring "[w]hile a described building, whether intended for occupancy by owner or tenant, is vacant beyond a period of sixty consecutive days or is unoccupied beyond a period of six consecutive months."

In April 2003, plaintiffs hired Stewart Shipper, a public adjuster, to help them with their claim. In an April 17, 2003, letter, Kathy Macdonald, defendant's adjuster, stated that she had spoken with members of the McNeel family and they had indicated that no one had resided in the dwelling for approximately 18 months and that there was no furniture in the dwelling. The letter concluded, "[d]ue to the above we are denying coverage for this claim." Shipper responded with a May 12, 2003, letter stating that members of the family disputed Macdonald's statements regarding residency, and he included a list of personal property that was in the home at the time of the fire. He concluded by stating that "your denial of the claim is wrongful" and asking her to "reconsider your denial and contact me for discussion of an adjustment and payment by Farm Bureau Insurance." In a separate letter of the same date, Shipper also sent in calculations of actual cash value. On May 13, 2003, Shipper submitted a "Sworn Statement in

---

[1] The cause of the fire was "undetermined" because it could have been accidental or suspicious. It was thought to have been set by a serial arsonist in the area.

Proof of Loss" signed by Wakelin McNeel, trustee of the Kathleen McNeel Revocable Living Trust.

In a letter dated May 22, 2003, Macdonald stated: "In response to your letter of May 12, 2003 we are continuing our investigation into this matter. As soon as we have completed this investigation we will be in contact with you to discuss your client's claim further." On the same date, Macdonald sent another letter, noting that the sworn proof of loss was incomplete and that the insured had to remedy this error within 15 days. The letter stated in bold print, **"This is not a denial of your claim but rather a rejection of the Proof of Loss which was incorrectly completed."** Shipper timely resubmitted the information.

On June 16, 2003, Shipper wrote to Macdonald stating:

> I am following up on the telephone messages that I left you on June 9th, June 13th and most recently, this morning. In your correspondence of May 12, 2003, you indicated that you are continuing your investigation into this matter. Please advise when you will be ready to speak with us to adjust the claim.

On June 26, 2003, Macdonald wrote to Shipper and stated, "After careful review of this matter along with additional investigation, we feel that we are justified in our denial of the above claim." The letter stated that it was "Farm Bureau's position" that the dwelling had been unoccupied for 18 months, as substantiated by relatives of the insured and a neighbor.

The following day, June 27, 2003, Shipper wrote to Jason Babka, Macdonald's claims supervisor. The letter confirmed that Shipper had "contact[ed Babka] to try to correct a wrongful denial of the Insured's claim" and that Shipper had "agreed to provide certain information which reflects on the meaning of vacancy and unoccupancy." The

letter enclosed excerpts from two insurance texts and concluded, "Please review and advise."

On June 30, 2003, Babka wrote back to Shipper. The letter quoted from the definitions of unoccupied in a third source, Fire, Casualty and Surety Bulletins (FC&S), and concluded, "Based on the definitions provided, our investigation, and the policy language under the increase in hazard, we must again respectfully deny the claim for fire damage to 10981 W. River Rd in Remus, Michigan of March 18, 2003."

On July 21, 2003, Shipper faxed a letter to Babka requesting page citations for the cited text and stating that "[y]ou have denied the Insured's claim based on an FC&S reference." On the same date, Babka sent a response stating that the claim was not denied on the basis of an FC&S definition and that "[t]he claim was denied based on the facts of the loss and our investigation, as well as the applicable policy language."

On September 24, 2003, Shipper wrote another letter to Babka, which stated:

> I have reviewed Farm Bureau's claim denial with the Insured. I am writing to ask for an appointment with you to discuss Farm Bureau's refusal to respond to the claim. The attorneys that I have spoken to state that the controlling issue will likely be a determination as to whether the house was abandoned. You may or may not decide to continue to deny the claim, but you should understand the reasons the Insured believes that the house was occupied. We can meet at your office or another agreeable location. I would like to arrange the meeting as soon as possible because, in the face of your denial, I must soon recommend an attorney for the future handling of this matter.

The record does not contain a response, but on October 10, 2003, Shipper and Babka did meet. According to an affidavit signed by Shipper, at the meeting Babka

requested that I obtain and send him utility bills for the subject property (which would indicate that the power had been on, contrary to what one would expect in a vacant/abandoned property) and evidence of payment of property tax bills (which again would illustrate that the property was not vacant/abandoned). . . . Mr. Babka indicated he would consider the claim in light of the requested documents, once submitted, and would only make a decision as to whether or not the claim would be denied <u>after</u> he had done so. [Underlining in original; paragraph structure altered.]

Defendant filed a responsive affidavit signed by Babka. It stated, "Farm Bureau never contradicted its initial denial of Plaintiff's [sic] claim, that Farm Bureau's position never changed from the initial denial and that I never conveyed to Mr. Shipper otherwise."

Following up from the meeting, Shipper sent a letter and facsimilie on October 14, 2003, attaching utility bills and property tax receipts that he asserted, along with the contractor's remodeling estimates, "are indicative of an intent to continue to operate and occupy the property." Babka responded with a letter of the same date stating:

I have carefully reviewed the additional documents you have submitted regarding this claim. Our findings still indicate that the house was both vacant and unoccupied, as we have previously outlined in our correspondence of June 30, 2003 and June 26, 2003. Based on this, we must respectfully continue to deny your client's claim.

Plaintiffs filed their complaint against defendant in the Mecosta Circuit Court[2] on October 5, 2004. In April 2005, defendant moved for summary disposition for failure to file within one year of the date the claim was

---

[2] Although the Bundy farmhouse is actually in Isabella County, halfway through the first day of trial, defendant stipulated that venue was proper in Mecosta County.

formally denied. MCL 500.2833(1)(q).[3] Plaintiffs op-
posed the motion. At a hearing on June 17, 2005, the
trial court denied the motion, noting that there was a
factual dispute about when the formal denial occurred
and specifically referring to Shipper's and Babka's
affidavits.

At trial, defendant abandoned the issue of when the
formal denial occurred; defendant presented no evi-
dence on the issue and did not request that the jury
make a determination. The jury returned a verdict for
plaintiffs, concluding that the farmhouse had not been
vacant at least 60 consecutive days before the loss and
that it "was occupied at least six consecutive months
prior to the loss date . . . ." It awarded $3,000 for
furnishings, $7,000 for other personal property, and
$15,000 for lost rents. The trial court issued a judgment
on the verdict for $69,500, reflecting the $50,000 policy
limit on the building, the $10,000 policy limit on lost
rents, $3,000 for landlord furnishings, the $2,500 policy
limit for other personal property, and $4,000 for the
stipulated debris removal.

Plaintiffs moved for case-evaluation sanctions, inter-
est, and costs. With regard to the interest claim, defen-
dant acknowledged this Court's decision in *Griswold*

---

[3] MCL 500.2833(1)(q) provides:

(1) Each fire insurance policy issued or delivered in this state
shall contain the following provisions:

\* \* \*

(q) That an action under the policy may be commenced only
after compliance with the policy requirements. An action must be
commenced within 1 year after the loss or within the time period
specified in the policy, whichever is longer. *The time for commenc-
ing an action is tolled from the time the insured notifies the insurer
of the loss until the insurer formally denies liability.* [Emphasis
added.]

*Props, LLC v Lexington Ins Co*, 276 Mich App 551, 554; 741 NW2d 549 (2007), but objected to the interest claim on the basis of the prior caselaw in *Arco Indus Corp v American Motorists Ins Co (On Second Remand, On Rehearing)*, 233 Mich App 143; 594 NW2d 74 (1998). The trial court concluded that defendant's denial was reasonable, but also concluded that *Griswold* applied retroactively and awarded 12 percent interest on the $54,500 of the award. On the attorney-fee issue, the trial court ultimately issued an opinion that granted plaintiffs 43 hours at $150 an hour in attorney fees. It assessed 12 percent interest on the $54,500 retroactively beginning on July 13, 2003, with the remainder of the award subject to interest accrued from the date of the complaint. Defendant appealed, and plaintiffs cross-appealed.

## II. SUMMARY DISPOSITION

Defendant first argues that the trial court erred by denying its motion for summary disposition because plaintiffs' suit was untimely even with the extension under MCL 500.2833(1)(q). Plaintiffs contend that defendant has waived its right to claim that the complaint was untimely by failing to raise the issue at trial, but that even if the issue was preserved, there was evidence of a genuine issue of material fact regarding when defendant "formally denie[d]" plaintiffs' claim, making the trial court's denial of summary disposition appropriate.

We review de novo motions for summary disposition, taking the facts in the light most favorable to the nonmoving party. *Dressel v Ameribank*, 468 Mich 557, 561; 664 NW2d 151 (2003). We review the record and the documentary evidence, but do not make findings of fact or weigh credibility. *Taylor v Lenawee Co Bd of Co Rd Comm'rs*, 216 Mich App 435, 437; 549 NW2d 80 (1996).

We agree with plaintiffs that defendant waived its affirmative statute-of-limitations defense at trial. Defendant did not seek a jury finding regarding when the formal denial occurred and failed to present any evidence at trial that the denial occurred anytime other than October 14, 2003. The defense made a tactical decision not to argue this issue to the jury and focused solely on whether the policy provided coverage. However, this waiver did not waive defendant's right to appeal the trial court's denial of summary disposition. Although defendant waived any complaint of error on this issue at trial, defendant may still argue on appeal that the trial should never have occurred because the trial court improperly denied summary disposition on the issue. Thus, the issue is whether the trial court was correct that there was an outstanding question of fact material to the determination of when the formal denial that stopped the tolling under MCL 500.2833(1)(q) occurred.

Given the language of the letters, we agree with plaintiffs that the April 2003 denial was withdrawn by the May 22, 2003, letters stating that "[t]his is not a denial of your claim" and that "we are continuing our investigation into this matter." (Bold print omitted.) However, we conclude that a second formal denial did occur later. On June 26, 2003, Macdonald wrote to Shipper and stated that "we feel that we are justified in our denial of the above claim." In his letter to Babka, Shipper acknowledged the denial by stating that he was attempting to "correct a wrongful denial . . . ." The subsequent correspondence back and forth between the parties continued to mention a denial: "we must again respectfully deny the claim"; "[y]ou have denied the Insured's claim"; "[t]he claim was denied"; "I have reviewed Farm Bureau's claim denial with the Insured"; and "[y]ou may or may not decide to continue to deny the claim . . . ."

However, we do not believe that the trial court erred by determining that there was a question of fact given Shipper's affidavit stating that he wrote Babka on September 24, 2003, requesting a meeting and that the two of them met on October 10, 2003. According to Shipper's affidavit, "Babka indicated he would consider the claim in light of the requested documents, once submitted, *and would only make a decision as to whether or not the claim would be denied after he had done so.*" (Emphasis added; underlining in original.)

The trial court properly concluded that this evidence created a question of material fact about when the formal denial occurred. Although it is reasonable to construe Babka's letter on October 14, 2003, and his affidavit responding to the Shipper affidavit as evidence of an unbroken denial since June 2003, Shipper's affidavit presents evidence that creates a different inference—that defendant again withdrew its formal denial while it reinvestigated the claim. This inference is even more reasonable considering defendant's prior course of conduct, having once before withdrawn a denial of the claim. Taking this evidence in the light most favorable to plaintiffs, *Dressel*, 468 Mich at 561, Shipper's affidavit and defendant's previous withdrawal of its formal denial provided sufficient evidence to create a question of fact regarding whether Babka's alleged comments at the meeting with Shipper constituted another withdrawal of the denial, with a subsequent denial on October 14, 2003. The trial court properly left it up to a jury to determine whether Babka made the comments attributed to him in Shipper's affidavit and whether those comments constituted a withdrawal of defendant's previous formal denial followed by a new formal denial. Accordingly, we conclude that the trial court properly denied defendant's motion for summary disposition. This question was properly

held for a jury determination, and defendant elected to
waive that determination.[4] We find no error.

### III. OCCUPANCY

Defendant next argues that the trial court's jury
instruction regarding occupancy was erroneous and
that the following instruction should have been given:
"One must consistently or habitually live there as a
customary and usual dwelling place or place of abode or
place of habitation. Mere supervision and periodic
checking or overnight visitations or storage or furniture
is not enough to satisfy an occupancy." However, this

---

[4] Despite the defense's decision not to submit the issue to the jury,
defendant's witnesses and counsel made several statements at trial that
seem inconsistent with its claim that the June denial remained in effect.
Although these statements are not relevant to our review of the summary
disposition ruling because they occurred after that ruling, defendant does
appear to have been trying to have it both ways. On the one hand, when
it moved for summary disposition, it argued to the court that it was
beyond question that the claim had been formally denied before October.
On the other hand, defendant sought to gain a tactical advantage at trial
by repeatedly telling the jurors, in an apparent appeal to their sense of
fair play, that the company had gone so far as to keep the claim open
through October.

Defense counsel argued in his opening statement that Babka "kept
this claim open . . . for review for a period of April, 2003, to October of
2003" and later reiterated that Babka "kept it open for six months"
because he "wanted to be fair." During trial, Macdonald testified that it
was her understanding that the claim was kept open until October of
2003. Babka testified that the reserve on the claim was not closed until
October 29, 2003, and that when that was done, the denial was a done
deal and he was not going back on the denial. Finally, in defendant's
closing argument, counsel stated that Babka spent five months, i.e.,
through October, going over things with Shipper and that after that time
"those two agreed to disagree."

We do not conclude that these statements constituted judicial admis-
sions. See *Ortega v Lenderink*, 382 Mich 218, 222-223; 169 NW2d 470
(1969). However, we do question whether the defense would have taken
this position at trial if the jury had in fact been permitted to decide the
date of formal denial.

definition was never presented to the trial court. Indeed, the definitions requested by defendant were entirely different. Defendant's trial brief defined "unoccupied" as **"ROUTINELY DEVOID OF HUMAN PRESENCE."** (Bold print in original.) Defendant's proposed jury instructions stated, "[*u*]*noccupied*: means not routinely characterized by the presence of human beings, or nobody is living there." Obviously, there was no error in the trial court's failure to give an instruction that was never requested. Nevertheless, defendant expressed a general objection to the instruction. The question becomes what standard of review applies to this issue.

MCR 2.516(C) provides, "A party may assign as error the giving of or the failure to give an instruction only if the party objects on the record before the jury retires to consider the verdict . . . , stating specifically the matter to which the party objects and the grounds for the objection." Here, the entire objection was "we're going to go with the one jury instruction with respect to occupancy. However, both of us have some misgivings about it and each of us wants to preserve our right to, I guess, contest it after the fact depending on who wins." Because the rule requires the objecting party to specifically state the grounds for the objection on the record, and the record in this case lacks any statement of grounds for the objection, this issue is unpreserved. Accordingly, our review is for plain error affecting defendant's substantial rights. *Hilgendorf v St John Hosp & Med Ctr Corp*, 245 Mich App 670, 700; 630 NW2d 356 (2001).

The trial court instructed the jury:

> In determining whether the [Bundy] farmhouse was vacant or unoccupied before the fire loss as alleged in this case, you are instructed to use the following definitions:

Vacant means the residence was completely empty and was—and has insignificant furnishings or property to support its intended purpose as a rental property.

Unoccupied. Unoccupied means operations or other activities in the building are suspended but contents remain in the building and [sic] is not being lived in for a period of six consecutive months.

Defendant argues on appeal that the definition of "unoccupied" is improper. Because "unoccupied" is a term used in the insurance policy, the question is one of contract interpretation.

"[I]n reviewing an insurance policy dispute we must look to the language of the insurance policy and interpret the terms therein in accordance with Michigan's well-established principles of contract construction." *Henderson v State Farm Fire & Cas Co*, 460 Mich 348, 353-354; 596 NW2d 190 (1999).

First, an insurance contract must be enforced in accordance with its terms. A court must not hold an insurance company liable for a risk that it did not assume. Second, a court should not create ambiguity in an insurance policy where the terms of the contract are clear and precise. Thus, the terms of a contract must be enforced as written where there is no ambiguity.

While we construe the contract in favor of the insured if an ambiguity is found, this does not mean that the plain meaning of a word or phrase should be perverted, or that a word or phrase, the meaning of which is specific and well recognized, should be given some alien construction merely for the purpose of benefiting an insured. The fact that a policy does not define a relevant term does not render the policy ambiguous. Rather, reviewing courts must interpret the terms of the contract in accordance with their commonly used meanings. Indeed, we do not ascribe ambiguity to words simply because dictionary publishers are obliged to define words differently to avoid possible plagiarism. [*Id.* at 354 (citations omitted).]

The contract provision at issue provides that there is no coverage "[w]hile a described building, whether intended for occupancy by owner or tenant, is vacant beyond a period of sixty consecutive days or is unoccupied beyond a period of six consecutive months." The parties agree that "unoccupied" is not defined in the policy. When terms are undefined, it is appropriate for this Court to consult a dictionary for the common definition. *Halloran v Bhan*, 470 Mich 572, 578; 683 NW2d 129 (2004).[5] "Vacant" is defined as "[h]olding nothing: empty." *Webster's New Basic Dictionary* (2007). "Unoccupied" is similarly defined as "[n]ot occupied: empty." *Id.* The most applicable definition of "occupy" would appear to be "[t]o live in." *Id.* Putting those definitions together, "unoccupied" means not lived in.

Using these definitions, we conclude that the trial court's jury instruction was proper. The trial court said that "unoccupied" meant that the building had contents but "is not being lived in . . . ." It gave the appropriate duration from the contract provision of "six consecutive months." Thus, the instruction informed the jury that it had to determine whether the Bundy farmhouse had not been lived in for more than six consecutive months. We find no plain error. *Hilgendorf*, 245 Mich App at 700.

Defendant argues that this Court's opinion in *Vushaj v Farm Bureau Gen Ins Co of Mich*, 284 Mich App 513; 773 NW2d 758 (2009), is controlling on this issue. We disagree. First, defendant's contention that *Vushaj* "should have been incorporated into a proper jury instruction" defies logic because it ignores the fact that

---

[5] Although *Halloran* relates to statutory interpretation, the rules are the same for contract interpretation. See *Citizens Ins Co v Pro-Seal Service Group, Inc*, 477 Mich 75, 82-85; 730 NW2d 682 (2007).

*Vushaj* was not decided until after this appeal had already begun. More important, the policy language at issue in *Vushaj* is markedly different and distinguishable. The *Vushaj* policy precluded coverage if the house was "vacant or unoccupied beyond a period of 30 consecutive days." *Id.* at 519. The present policy exempted coverage when the house "is vacant beyond a period of sixty consecutive days or is unoccupied beyond a period of six consecutive months." Thus, the present policy clearly separates the terms "vacant" and "unoccupied" into different clauses with distinct time requirements. Such a structure leads to the conclusion that the two terms have different meanings.

> [M]ost authorities have distinguished the terms "vacant" and "unoccupied." The term "vacant" has been construed to mean empty, deprived of contents, and without inanimate objects. It implies entire abandonment, and non-occupancy for any purpose. On the other hand "unoccupied" has been held to mean without animate objects, and implies that no actual use is being made of the premises by anyone corporeally present or in possession. [45 CJS, Insurance, § 1002, p 467.]

See also Garner, *A Dictionary of Modern Legal Usage* (2d ed) ("[V]acant; unoccupied. These words are often used in the context of insurance policies on buildings. They are not synonymous: *vacant* means without inanimate objects, while *unoccupied* means without human occupants."). The necessity that "vacant" and "unoccupied" have different meanings within the instant policy is enhanced by the fact that each term has its own time limit: vacant for 60 days; unoccupied for six consecutive months. *Vushaj* simply had a single period that applied to either term.

Furthermore, it is the definition of "unoccupied," not "occupied," that is at issue. This difference is more than academic. Defendant asserts that "[t]he plain meaning

of the contract requires that someone be living in the house as a legal abode for six months before the loss." Whether intentionally wrong or simply inartfully worded, this is a misinterpretation of the policy language. There is no requirement that the farmhouse be lived in "for six months before the loss." Rather, the house must be *unoccupied* "beyond" (that is, for more than) six consecutive months before a loss for the exclusion to take effect. The house could have been unoccupied for six months, but as long as it became occupied on the next day, the exclusion would never be operative because the house was not unoccupied *for more than* six months. As the policy is currently phrased, even a single day of occupancy will restart the counter on the six consecutive months. This requirement further distinguishes *Vushaj*, because application of *Vushaj*'s definition of "unoccupied" (" 'not routinely characterized by the presence of human beings' ") *Vushaj*, 284 Mich App at 516, quoting Black's Law Dictionary (8th ed), would impermissibly render nugatory the instant policy's requirement that the there be a "consecutive" period of no occupancy. See *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003) ("[C]ourts must also give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory."). Because of the clear differences between the instant policy and the policy that was interpreted in *Vushaj*, we find *Vushaj* inapplicable.

Finally, defendant contends that there was insufficient evidence to create a jury question about occupancy. However, defendant's argument presupposes that the definition given by the trial court was erroneous. Defendant has not argued on appeal that there was insufficient evidence under the definition stated in the jury instructions. Accordingly, our determination that

there was no error in the definition given by the trial court has disposed of this issue.

### IV. RETROACTIVITY OF *GRISWOLD*

Defendant's final claim on appeal is that the trial court erred by concluding that this Court's decision in *Griswold*, 276 Mich App 551, applied retroactively. In *Griswold*, this Court held that "a first-party insured is entitled to 12 percent penalty interest if a claim is not timely paid, irrespective of whether the claim is reasonably in dispute." *Id.* at 554. Defendant argues that this rule should be applied prospectively only because it overruled clear and settled caselaw.

Whether a ruling applies retroactively is a question of law that this Court reviews de novo. *People v Maxson*, 482 Mich 385, 387; 759 NW2d 817 (2008). "[T]he general rule is that judicial decisions are to be given complete retroactive effect. We have often limited the application of decisions which have overruled prior law or reconstrued statutes. Complete prospective application has generally been limited to decisions which overrule clear and uncontradicted case law." *Hyde v Univ of Mich Bd of Regents*, 426 Mich 223, 240; 393 NW2d 847 (1986) (citations omitted).

Rules determined in opinions that apply retroactively apply to all cases "still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule[s]." *Harper v Virginia Dep't of Taxation*, 509 US 86, 97; 113 S Ct 2510; 125 L Ed 2d 74 (1993). Rules determined in opinions that apply prospectively only, on the other hand, not only do not apply to cases still open on direct review, but do not even apply to the parties in the cases in which the rules are declared. See *Pohutski v City of Allen Park*, 465 Mich 675, 699; 641 NW2d 219 (2002).

With this understanding, it is clear that this Court has already concluded that *Griswold* did not apply prospectively only because it applied its holding to the three cases consolidated in *Griswold* and ruled that the plaintiffs in all three cases were entitled to penalty interest, irrespective of whether the claims were reasonably in dispute. *Griswold*, 276 Mich App at 566-567. However, because there are no published opinions specifically holding that *Griswold* is fully retroactive,[6] we have considered defendant's claims. Nevertheless, we conclude that *Griswold* is fully retroactive.[7]

As previously noted, "[c]omplete prospective application has generally been limited to decisions which overrule clear and uncontradicted case law." *Hyde*, 426 Mich at 240. Here, there was simply nothing "clear and uncontradicted" about the "reasonable dispute" standard, particularly in light of the binding Michigan Supreme Court precedent in *Yaldo v North Pointe Ins Co*, 457 Mich 341, 348-349; 578 NW2d 274 (1998), that had explicitly rejected the "reasonable dispute" standard as contrary to the language of the statute.

Moreover, even assuming that *Griswold* represented a new rule, as opposed to a clarification of a previously ambiguous state of the law, the three-factor test set forth in *Paul v Wayne Co Dep't of Pub Serv*, 271 Mich

---

[6] There is an unpublished opinion so holding. *Frans v Harleysville Lake States Ins Co*, unpublished opinion per curiam of the Court of Appeals, issued September 23, 2008 (Docket No. 280173).

[7] We note that, for the purposes of this case, it makes no difference whether *Griswold* has full retroactivity or only limited retroactivity, because full retroactivity makes it applicable to all cases then pending and limited retroactivity applies "in pending cases where the issue had been raised and preserved." *Stein v Southeastern Mich Family Planning Project, Inc*, 432 Mich 198, 201; 438 NW2d 76 (1989). Because the issue was raised and preserved in this case, *Griswold* would apply even under limited retroactivity.

App 617; 722 NW2d 922 (2006), does not weigh in favor of prospective application.

> The threshold question in determining the application of a new decision is whether the decision in fact clearly established a new principle of law. If that question is answered in the affirmative, then a court must weigh three factors in deciding whether a judicial decision warrants prospective application: (1) the purpose to be served by the new rule, (2) the extent of reliance on the old rule, and (3) the effect of retroactive application on the administration of justice. [*Id.* at 621.]

There are multiple purposes served by the new rule. First, it clarified an ambiguous state of the law. Second, it was intended to give meaning to the statutory language, which appears designed to deter, and limit the length of, denials of justified claims. The "timely payment" purpose weighs heavily in favor of retroactive application because prospective application removes the incentive of limiting any further delay of payment with regard to justified claims already in litigation when *Griswold* was decided.

The second factor is the extent of reliance on the old rule. It is true that the insurance industry relied heavily on the *Arco* decision to delay payment in claims that were reasonably in dispute. However, when an insurance company truly has a complete defense, i.e., it is ultimately determined that there is no coverage, the company is relieved from any requirement to pay interest. Additionally, given the ambiguous state of the law, it is unclear how reasonable the reliance on *Arco* was, given that it contradicted the Supreme Court's precedent in *Yaldo*. Thus, this factor does not seem to weigh heavily in either direction.

The third factor, the effect of retroactive application on the administration of justice, weighs in favor of

retroactive application. Given the limited number of cases to which this issue applies, applying the *Griswold* decision retroactively will have little effect on the courts and their caseloads.

Given that (1) the *Griswold* Court retroactively applied its decision to the three consolidated cases before it and at least one subsequent panel of this Court determined it to be retroactive, (2) the law that was overturned can hardly be considered "clear and uncontradicted," and (3) the factors for prospective-only application weigh in favor of retroactive application, we conclude that the trial court properly ruled that *Griswold* was to be applied retroactively and, therefore, was applicable to this case.

### V. ATTORNEY FEES

Plaintiffs argue in their cross-appeal that the trial court erroneously and arbitrarily reduced their attorney's hours by 46 percent on the basis of a patently erroneous premise that counsel had padded his billing.[8] Although this Court reviews de novo a trial court's decision to grant case-evaluation sanctions, the amount awarded as reasonable attorney fees is reviewed for an abuse of discretion. *Peterson v Fertel*, 283 Mich App 232, 235, 239; 770 NW2d 47 (2009). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id.* at 235.

Plaintiffs' counsel originally provided to the trial court a two-page typed time sheet memorializing 115.4 hours that he had spent working on the case after the case evaluation. Defendant objected, indicating that its

---

[8] Plaintiffs have conceded that the reduction of their counsel's hourly rate from $350 to $150 was within the court's discretion. Accordingly, the issue on appeal is limited solely to the number of hours to which this rate was applied.

counsel "spent only 90.2 hours" for the same period and, after objecting to several entries, stated that "[g]iven these reductions, the total amount of attorney time that could reasonably be awarded would be approximately 90 hours." Defendant also requested an evidentiary hearing "and a more exact accounting" of the time indicated on the billing statement.

During the hearing for case-evaluation sanctions, plaintiffs' counsel justified his time, indicating that he had worked on the case for only five hours from the case evaluation until 10 days before the trial, when it became clear that it was going to go to trial. He further indicated that the case filled three bankers boxes because it was document-intensive and argued against defendant's assertion that it was a simple case:

> It involved technical contract issues, definition of technical terms, occupancy and vacancy, which are not the same thing as they are out there in the real world. When we talked about an insurance contract earlier in the litigation, it involved interpretation and doing battle over MCL 500.2833 regarding limitation issues. It's a very technical case.

Defendant's counsel argued that he still believed that plaintiffs' counsel was only entitled to $9,000 (90 hours times a rate of $100 an hour) and requested an evidentiary hearing. He maintained that it was "a simple case to try, not difficult at all in my mind" and that damages had been agreed to so that the jury only had to decide whether the farmhouse was vacant or unoccupied.

At the evidentiary hearing on attorney fees, plaintiffs' counsel testified regarding his billing records. He testified that he filled out his handwritten record of time spent at the same time that the work was performed. He also justified each of the items about which he was questioned and testified that he had worked the

hours listed. The trial court took issue with the time plaintiffs' counsel indicated for the trial. According to the time records, plaintiffs' counsel billed 46 hours for the trial and trial preparation for July 23 through 26. The trial court used 45 hours as the figure and determined that the time for the trial, including the jury's deliberations, was 17.5 hours. Plaintiffs' counsel indicated that there had been a great deal of trial preparation, but the trial court appeared flippant and told plaintiffs' counsel that the issue whether the house was occupied or unoccupied did not require much time because the trial court "figured that out in about five minutes." Plaintiffs' counsel then argued that it was clear that defendant's counsel had spent approximately as much time on the case as he had. The trial court rejected this argument because plaintiffs' counsel's records were not detailed enough.

The trial court issued its opinion and order, which held, in relevant part:

> Plaintiff's [sic] attorney submitted a hand written record of purported hours spent in preparation and actual time spent at trial. The most objective criteria that the Court has to determine the accuracy of the purported hours is the actual time that the Court observed the Plaintiff's [sic] attorney at trial. Plaintiff's [sic] attorney recorded thirty-six (36) hours that he claims to have been in trial, the Court's records indicate that the actual trial time was nineteen and one-half (19½) hours, an overstatement of sixteen and one-half (16½) hours or forty-six [percent] (46%).

> Using the Plaintiff's [sic] attorney records — claiming that trial preparation totaled forty-three and one-half (43½) hours — and using the above forty-six percent (46%) overage, the Court determined the preparation hours to be twenty-three and one-half (23½) hours, which reduces the hours of preparation by twenty (20) hours. Hence the total hours that

can be charged for attorney fees is forty-three (43) hours (19½ trial hours plus 23½ hours of preparation)[.]

Plaintiffs argue that the basis for the reduction was erroneous and unreasonable.

In determining a reasonable attorney fee, there is no set formula, but multiple factors to consider. *In re Temple Marital Trust*, 278 Mich App 122, 138; 748 NW2d 265 (2008). These factors include:

> (1) the skill, time and labor involved; (2) the likelihood, if apparent to the client, that the acceptance of the employment will preclude other employment by the lawyer; (3) the fee customarily charged in that locality for similar services; (4) the amount in question and the results achieved; (5) the expense incurred; (6) the time limitation imposed by the client or the circumstances; (7) the nature and length of the professional relationship with the client; (8) the professional standing and experience of the attorney; and (9) whether the fee is fixed or contingent. [*Id.* (citations omitted).]

Here, although the trial court discussed some other factors at the hearing, in its opinion, the trial court relied on a single factor—how much time it believed plaintiffs' counsel had actually spent on the case. However, given the testimony at the hearing and the information on plaintiffs' counsel's time sheet, the trial court's calculation was erroneous. The time sheet indicated, and plaintiffs' counsel testified at the hearing, consistently with the time sheet, that he did more than the trial on the days listed for the trial—he also did preparation for the next day of trial. Accordingly, the trial court's determination of a 46 percent overbilling was inconsistent with the record, making its reduction based on this calculation erroneous.

Further, the contention of defendant and the trial court that the sole matter in dispute was the definitions of "occupancy" and "vacancy" was erroneous because it

ignored several outstanding issues that could have come up at trial, for which plaintiffs' counsel needed to be prepared. There was an outstanding factual question about when defendant could be deemed to have formally denied the claim in order to trigger the statutory one-year deadline. That defendant ultimately failed to address this issue at trial is irrelevant. Plaintiffs still had to prepare to fight this issue and present evidence and testimony relevant to it because they had no way to know before the trial that defendant was not going to address it.

The same is true with regard to the stipulations to which defendant refers. These stipulations were made *during* trial. For example, it was not until the end of the second day of trial that defendant stipulated "a $4,000 debris removal amount" and a $50,000 cash value for the dwelling. Even if the stipulations had been made the morning of trial, it would not have changed the fact that plaintiffs' counsel had to be prepared to present evidence on those issues. Moreover, even with these stipulations, there were still outstanding issues regarding the amount of lost rents, the value of landlord furnishings, and the value of the owner's other personal property that were left to the jury to decide. Additionally, with plaintiffs presenting their case first, they had to put all their evidence regarding the formal denial and the subsequently stipulated values into evidence and assume that defendant was going to counter it during its presentation of the evidence. Again, just because defendant ultimately decided not to address those issues or agreed to stipulate certain amounts did not make the time plaintiffs' counsel was required to prepare for those disputed issues, including the presentation of witnesses and documents at trial, unreasonable or unnecessary.

Both defendant and the trial court made much of the fact that plaintiffs' counsel had not itemized his

time in six-minute increments or used time slips, but instead kept a running handwritten record indicating clumps of time spent. Plaintiffs' counsel testified that he filled out his handwritten record contemporaneously with when the work was completed and that it was not more detailed because he had a contingent-fee arrangement with his clients. We conclude that under Michigan law, the billing records submitted by plaintiffs' counsel were sufficient. Indeed, this Court has held that descriptions such as "trial prep" and "trial" in billing records are self-explanatory:

> [I]n order for the trial court to arrive at a reasonable attorney fee award, it must determine what services were actually rendered. Although a detailed bill of costs is not required, some documentation is needed to enable the trial court to determine the proper amount to award. . . .
>
> Although plaintiff's counsel did not list exactly what she was doing with regard to her "trial" and "trial prep" submissions, . . . lawyers generally know what other lawyers do during "trial" and "trial prep"—review the pleadings, review discovery responses, read depositions, prepare experts, prepare lay witnesses, prepare for cross-examinations, prepare opening and closing arguments, prepare exhibits, attend the trial, and so forth. The list is quite extensive but well known, i.e., there are no surprises. . . . It would be unreasonable to force lawyers, who do not even know if they will be entitled to case evaluation sanctions at the time they are preparing for and attending the trial, to record exactly what they were doing at every "billable" moment. And, it is unnecessary. The trial court can certainly consider the type of case, the length of the trial, the difficulty of the case, the numbers and types of witnesses, as well as other relevant factors, and determine what services were necessitated by the rejection of the case evaluation. We refuse to require an exhaustive and detailed list of the precise service provided at every moment. [*Young v Nandi*, 276 Mich App 67, 88-89; 740 NW2d 508 (2007), vacated in part on other grounds 482 Mich 1007 (2008) (citation omitted).]

In sum, plaintiffs' counsel's billing records were legally sufficient, his testimony supported his claims of time spent, and no contrary evidence was presented. Although the trial court took issue with his time claimed for the trial, plaintiffs' counsel stated that the listed time was not *solely* time spent in trial, but included preparation for the next day's presentation. There is simply nothing in the record to support the trial court's application of a 46 percent reduction in hours billed to come up with a "reasonable" fee. The trial court gave only mild consideration to the complexity of the case, and even when it did so, it disregarded the fact that plaintiffs had to be prepared to argue all the issues, even if defendant ultimately waived or stipulated with regard to them. Accordingly, the trial court abused its discretion in its determination of a reasonable attorney fee.

We therefore reverse the trial court's assessment of attorney fees and remand the issue back to the trial court. On remand, the trial court should examine the appropriate factors listed earlier in this opinion in view of the evidence obtained at the previous hearing. However, given the repeated representations of defendant's counsel that 90 hours was reasonable (indeed, he spent that many hours working on the case after the case evaluation), we hold that the minimum to which plaintiffs are entitled is $13,500 (the trial court's rate of $150 an hour times 90 hours).

Affirmed in part, reversed in part, and remanded for additional proceedings consistent with this opinion. Plaintiffs are entitled to costs under MCR 7.219. We do not retain jurisdiction.

M. J. KELLY, P.J., concurred.

K. F. KELLY, J. (*dissenting*). I respectfully dissent. In my view, plaintiffs' claim is time-barred under MCL 500.2833(1)(q), and the trial court erred by denying defendant's motion for summary disposition. Further, the majority's conclusion that a question of fact exists regarding when the formal denial occurred is erroneous because (1) it fails to apply the plain language of MCL 500.2833(1)(q), (2) it applies the long-discredited judicial tolling doctrine, and (3) it implicitly applies the doctrine of equitable estoppel in the absence of facts supporting its application. I would reverse.

### I. BASIC FACTS AND PROCEDURAL HISTORY

Plaintiffs' property was destroyed by fire on March 18, 2003. Defendant's policy provided coverage to the property and its contents. Plaintiffs promptly notified defendant of the loss.

On April 17, 2003, by certified mail, defendant's senior claims representative, Kathy Macdonald, wrote to plaintiffs' adjuster, Stewart Shipper of Associated Adjusters, Inc., denying coverage for the claim, stating, in relevant part:

> Enclosed please find a copy of our Farm Bureau Mutual Farmowners Policy with regards to the above claim. Please note on page 10 #31 Increase in Hazard. Unless otherwise provided in writing, we will not be liable for loss occurring: b. while a described building, whether intended for occupancy by owner or tenant, is vacant beyond a period of sixty consecutive days or is unoccupied beyond a period of six consecutive months.
>
> In speaking with Maria McNeel and Wakelin McNeel both indicated that no one has actually resided in the dwelling for approximately 18 months. There was no furniture in the dwelling to constitute occupancy.

*Due to the above we are denying coverage for this claim.*
[Emphasis added.]

On May 12, 2003, Shipper wrote defendant, acknowledging receipt of defendant's denial of plaintiffs' claim on the basis of "Increase in Hazard" but contesting its conclusion that the property was unoccupied or vacant. In addition, Shipper submitted a list of personal property lost in the fire, as well as the cash value of the listed property. In conclusion, he requested defendant to "reconsider [its] denial[.]"

On May 22, 2003, Macdonald wrote to Shipper, stating: "In response to your letter of May 12, 2003 we are continuing our investigation into this matter. As soon as we have completed this investigation we will be in contact with you to discuss your client's claim further." Also on May 22, 2003, by certified mail, defendant rejected plaintiffs' "Sworn Statement in Proof of Loss"[1] and provided plaintiffs with an additional 15 days to resubmit the statement. Defendant also specifically notified plaintiffs that "[t]his is not a denial of your claim but rather a rejection of the Proof of Loss which was incorrectly completed." (Bold print omitted.)

After additional investigation, defendant wrote to Shipper on June 26, 2003, and denied plaintiffs' claim:

> After careful review of this matter along with additional investigation, we feel that we are justified in our denial of the above claim.
>
> It is [defendant's] position that the dwelling located at 10981 W. River Rd., Remus, MI was vacant and unoccupied at the time of the loss and for approximately

---

[1] Presumably, the "Sworn Statement in Proof of Loss" referred to Shipper's earlier submission of the list of personal property lost in the fire.

1¹/₂ years prior to this fire. This was substantiated to us
by relatives of the named insured along with neighbor's
[sic] of this dwelling.

*Due to these facts we cannot honor the above claim.*
[Emphasis added.]

The following day, Shipper requested further reconsideration of defendant's denial of plaintiffs' claim, continuing to contend that it was "wrongful." This request did not raise any factual dispute about the fire or its cause, but was based solely on the interpretation of the policy terms "vacant" and "unoccupied." Of particular note, Shipper's letter specifically recognized defendant's denial of the claim.

Three days later, on June 30, 2003, defendant reaffirmed its earlier denial of plaintiffs' claim:

[Defendant has] also reviewed your documentation regarding the definition of vacant. . . . Our investigation indicates that the home did not sustain sufficient furnishings to maintain it as a residence.

Based upon the definitions provided, our investigation, and the policy language under the increase in hazard, *we must again respectfully deny* the claim for fire damage to 10981 W. River Rd in Remus, Michigan of March 18, 2003. [Emphasis added.]

On July 21, 2003, Shipper once again acknowledged defendant's denial "based on an FC&S[2]reference" but requested information on how to locate the reference. On the same day, defendant responded to the request, stating:

This letter is in response to [y]our correspondence of July 21, 2003. Your letter is incorrect in stating that we have denied the insured's claim based on a FC&S refer-

---

[2] FC&S stands for "Fire, Casualty and Surety Bulletins."

ence. *The claim was denied based on the facts of the loss and our investigation, as well as the applicable policy language.*

On September 24, 2003, Shipper again wrote defendant requesting further consideration. Notably, Shipper once again acknowledged and recognized that the claim had been denied, that defendant could continue to deny the claim, and that the time limit to initiate litigation was approaching:

> I have reviewed Farm Bureau's claim denial with the Insured.
>
> I am writing to ask for an appointment with you to discuss Farm Bureau's refusal to respond to the claim.
>
> The attorneys that I have spoken to state that the controlling issue will likely be a determination as to whether the house was abandoned.
>
> You may or may not decide to continue to deny the claim, but you should understand the reasons the Insured believes that the house was occupied.
>
> We can meet at your office or another agreeable location.
>
> I would like to arrange the meeting as soon as possible because, *in the face of your denial, I must soon recommend an attorney for the further handling of this matter.* [Emphasis added.]

On October 14, 2003, defendant *again* wrote Shipper that it would continue to deny plaintiffs' claim.

Plaintiffs filed their complaint against defendant on October 5, 2004. In April 2005, defendant moved for summary disposition for failure to file within one year from the date of defendant's denial of the claim. Plaintiffs argued that no formal denial of the claim pursuant to MCL 500.2833(1)(q) had occurred before October 14, 2003, and that the complaint had therefore been timely filed. Plaintiffs further argued that defendant waived

any right it had to rely on purported denials before that date because of defendant's inconsistent conduct.

The trial court denied the motion, concluding that there was a genuine issue of material fact regarding when the denial occurred.

## II. STANDARDS OF REVIEW

"Whether a period of limitations applies to preclude a party's pursuit of an action constitutes a question of law that we review de novo." *Detroit v 19675 Hasse*, 258 Mich App 438, 444; 671 NW2d 150 (2003). We also review de novo a trial court's ruling on a motion for summary disposition. *Benefiel v Auto-Owners Ins Co*, 277 Mich App 412, 414; 745 NW2d 174 (2007). In reviewing a motion under MCR 2.116(C)(7), we must accept the plaintiff's well-pleaded allegations as true, and we must "look to the pleadings, affidavits, or other documentary evidence to see if there is a genuine issue of material fact." *Huron Tool & Engineering Co v Precision Consulting Servs, Inc*, 209 Mich App 365, 376-377; 532 NW2d 541 (1995). If no question of fact exists, whether the plaintiff's claim is barred by a statute of limitations is a question for the court. *Id.* at 377. "However, if a material factual dispute exists such that factual development could provide a basis for recovery, summary disposition is inappropriate." *Id.* Further, this case also presents a question of statutory construction, which this Court reviews de novo. *People v Williams*, 475 Mich 245, 250; 716 NW2d 208 (2006).

## III. SUMMARY DISPOSITION WAS IMPROPERLY DENIED

Defendant argues that the trial court erred by denying its motion for summary disposition. I agree. In my view, when the plain language of MCL 500.2833(1)(q) is

applied to the facts of this case, the necessary conclusion is that plaintiffs' claim was untimely filed as a matter of law and the case should have been dismissed under MCR 2.116(C)(7).

### A. THE MEANING OF MCL 500.2833(1)(q)

Because it is my view that the majority fails to apply the language of MCL 500.2833(1)(q), an explanation of its meaning is necessary to understand the rule that must be applied to the facts of this matter. The primary goal of judicial interpretation of statutes is to ascertain and give effect to the intent of the Legislature. *Neal v Wilkes*, 470 Mich 661, 665; 685 NW2d 648 (2004). "If the statutory language is clear and unambiguous, judicial construction is neither required nor permitted, and courts must apply the statute as written." *USAA Ins Co v Houston Gen Ins Co*, 220 Mich App 386, 389; 559 NW2d 98 (1996). Nothing will be read into a clear statute that is not within the manifest intent of the Legislature as derived from the language of the statute itself. *Roberts v Mecosta Co Gen Hosp*, 466 Mich 57, 63; 642 NW2d 663 (2002), citing *Omne Fin, Inc v Shacks, Inc*, 460 Mich 305, 311; 596 NW2d 591 (1999).

MCL 500.2833(1)(q) provides:

(1) Each fire insurance policy issued or delivered in this state shall contain the following provisions:

* * *

(q) That an action under the policy may be commenced only after compliance with the policy requirements. An action must be commenced within 1 year after the loss or within the time period specified in the policy, whichever is longer. *The time for commencing an action is tolled from the time the insured notifies the insurer of the loss until the insurer formally denies liability*. [Emphasis added.]

In other words, it is the rule in Michigan, under the clear language of this provision, that fire insurance policies provide a "mandatory limitation period [for filing a lawsuit] of at least one year, with tolling, unless a longer period is specifically set forth in the insurance policy." *Randolph v State Farm Fire & Cas Co*, 229 Mich App 102, 106-107; 580 NW2d 903 (1998). Consistently with common sense, the statute makes the centerpiece for determining when the limitations period begins to run the point at which an insurer has formally denied liability. It is not surprising that the receipt of a formal denial will "unequivocally impress[] upon the insured that the extraordinary step of pursuing relief in court must be taken," *Lewis v Detroit Auto Inter-Ins Exch*, 426 Mich 93, 101; 393 NW2d 167 (1986), and the statute, accordingly, embodies this concept.

Because the focus of the present dispute is when the insurer formally denied liability, the relevant phrase of the statute for purposes of this litigation is "until the insurer formally denies liability." "Until" means "[u]p to the time of" and "[b]efore a specified time."[3] *The American Heritage Dictionary, New College Edition* (1976). Black's Law Dictionary (5th ed) defines "until" as follows: "Up to time of. A word of limitation, used ordinarily to restrict that which precedes to what immediately follows it, and its office is *to fix some point of time* or some event upon the arrival or occurrence of which what precedes will cease to exist." (Emphasis added; citation omitted.) Thus, under the statute, the one-year period is tolled " 'from the date of a specific claim for benefits to the date of a formal denial of

---

[3] While it should go without saying what the meaning of the word "until" is, I offer the dictionary definition of the word here. This Court may consult a dictionary to discern a word's common meaning. *Halloran v Bhan*, 470 Mich 572, 578; 683 NW2d 129 (2004).

liability.' " *Hudick v Hastings Mut Ins Co*, 247 Mich App 602, 607; 637 NW2d 521 (2001), quoting *Lewis*, 426 Mich at 101.

Our appellate courts have already parsed the meaning of the term "formal denial." "A denial of liability need not be in writing to be formal, but it must be explicit." *Mt Carmel Mercy Hosp v Allstate Ins Co*, 194 Mich App 580, 587; 487 NW2d 849 (1992) (citation omitted). Although the best formal notice is a writing, notice may be sufficiently direct to qualify as formal without being put into writing. *Mousa v State Auto Ins Cos*, 185 Mich App 293, 295; 460 NW2d 310 (1990). Accordingly, under this state's jurisprudence, a "formal denial" must be explicit and direct.

### B. PLAINTIFFS' CLAIM IS TIME-BARRED

Here, it is undisputed that the loss occurred on March 18, 2003. It is undisputed that defendant received the proof of loss on March 19, 2003. And, as the majority agrees, it cannot be disputed that defendant formally denied liability on June 26, 2003.[4] On that date, defendant informed plaintiffs in a letter that "we are justified in our denial of [your] claim" and "we cannot honor [your] claim." At that point, pursuant to the clear and unambiguous terms of MCL 500.2833(1)(q), the one-year limitations period for bringing suit was no longer tolled and the limitations period began to run.

Yet despite this formal denial, plaintiffs continually attempted to have defendant reopen their case rather than filing suit. Defendant, however, continued to refer back to its previous formal denial. In its written statements, defendant made the following explicit reassertions of its denial:

---

[4] In his affidavit filed in the trial court, Shipper also admits that on "June 26, 2003 . . . Farm Bureau denied the claim."

June 30, 2003: "[W]e must *again* respectfully deny the claim . . . ."

July 21, 2003: "The claim *was denied* based on the facts . . . ."

Oct 14, 2003: "[W]e . . . *continue to deny* your client's claim." (Emphasis added.)

Importantly, after each reiteration of defendant's decision to deny plaintiffs' claim, Shipper specifically and unequivocally *acknowledged* that defendant had earlier denied the claim. He repeatedly recognized the June 26, 2003, denial as early as June 27, 2003, and as late as September 24, 2003, and even wrote to defendant: "[I]n the face of your denial, I must soon recommend an attorney for the further handling of this matter." Clearly, plaintiffs knew at this point that "the extraordinary step of pursuing relief in court must be taken." *Lewis*, 426 Mich at 101.

Thus, it is undisputed on the record that plaintiffs failed to file suit within one year of defendant's June 26, 2003, formal denial of liability. Consequently, their claim is time-barred, and summary disposition should have been granted in defendant's favor. The trial court had before it all the written documentation affecting the instant claim and, thus, the question presented was merely a question of law. "[W]here written documents are unambiguous and unequivocal, their construction is for the Court to decide *as a matter of law.*" *Mt Carmel*, 194 Mich App at 588 (emphasis added);[5] see also *Huron*

---

[5] In *Mt Carmel*, this Court held that the following letter from the defendant insurance company constituted a formal denial of defendant Naima Nafso's claim for personal injury protection (PIP) benefits:

"Pursuant to our recent phone conversation, Mr. Amer Nafso and Akram P. Najor live at 19214 Bauman; Detroit, MI 48203; and are insured with State Farm, policy No. 532736261422.

*Tool*, 209 Mich App at 377. And, as these documents plainly and obviously showed, plaintiffs' complaint, filed more than a year after the formal denial, was untimely filed under the statute. The trial court erred by failing to properly apply the plain language of MCL 500.2833(1)(q) in the present matter. Summary disposition in defendant's favor should have been granted.

### C. SHIPPER'S AFFADAVIT DOES NOT CREATE A QUESTION OF FACT

The majority, however, contends that a question of fact exists about when defendant formally denied plaintiffs' claim because further discussions ensued between the parties regarding the claim after the June 26, 2003, denial letter. The majority relies on the affidavit of Shipper, who attested that defendant's agent allegedly agreed to meet with him in September 2003 and "indicated he would consider the claim in light of the requested documents . . . and would only make a decision as to whether or not the claim would be denied after he had done so." At the outset, assuming without conceding that the affidavit is even relevant, it must be noted that the statements of the claim adjuster are unsubstantiated in the record, are internally inconsistent, are merely self-serving allegations, and are even

---

"Therefore, a PIP claim for Naima Nafso must be filed with that company.

"We are in receipt of Mr. Nafso's application for benefits. We must know if, if [sic] anyone is taking Mr. Nafso's place in his store; and is the store suffering a loss due to Mr. Nafso's injuries?

"Please forward a copy of Mr. Nafso's policy with Continental Life Insurance Company." [*Mount Carmel*, 194 Mich App at 587 (emphasis omitted).]

This Court held that the "language of denial in the letter was unambiguous" and that the letter constituted a formal denial "*as a matter of law.*" *Id.* at 588 (emphasis added).

contradicted by Shipper's own contemporaneous writings to defendant. There simply is no substantiating evidence in the record that defendant indicated in September 2003 that it formally rescinded its denial[6] and would only deny the claim after it had reviewed certain requested documents other than plaintiffs' claim adjuster's unsubstantiated statements. Such bald allegations, which are arguably also inadmissible hearsay, without other support in the record, are insufficient to create a genuine issue of material fact. See *Town v Mich Bell Tel Co*, 455 Mich 688, 712 n 10; 568 NW2d 64 (1997) (RILEY, J., concurring); MCR 2.116(G)(4). Rather, the affidavit merely reflected a desire on Shipper's part to persuade defendant to settle the matter without a lawsuit. In hindsight, this desire turned out to be wishful thinking, and plaintiffs simply failed to assert their rights in a timely manner as required by MCL 500.2833(1)(q). While plaintiffs may very well have a cause of action against Shipper or their attorneys, or both, for failing to file the instant matter within the limitations period, the failure to file certainly cannot be attributed to defendant.

Further, even if the affidavit created a factual dispute in regard to the parties' correspondence, which it does not, it would nonetheless be irrelevant given that defendant formally denied plaintiffs' claim in June 2003 and defendant never made any direct, explicit formal rescission of that denial. The clear and unambiguous language of MCL 500.2833(1)(q) directs that the limitations period be tolled "until the insurer

---

[6] As set forth in part I of this opinion, defendant first formally denied plaintiffs' claim on April 17, 2003, but expressly and completely rescinded that denial in writing on May 22, 2003. The difference between the first formal denial of liability on April 17 and the denial of liability on June 26, 2003, is that defendant never directly and unequivocally withdrew or rescinded the June 26 denial.

formally denies liability." Shipper's ongoing attempts to settle the case without litigation were immaterial and should not be a consideration under the plain language of MCL 500.2833(1)(q). As previously noted, that provision plainly states, in relevant part: "An action must be commenced within 1 year after the loss or within the time period specified in the policy, whichever is longer. The time for commencing an action is tolled from the time the insured notifies the insurer of the loss *until* the insurer formally denies liability." MCL 500.2833(1)(q) (emphasis added). Absolutely nothing in the plain language of this provision permits a court to create a question of fact out of one party's subsequent attempts to settle if it is clear on the record that a formal denial had been made; the express language of the statute makes no exception for such behaviors or conduct. Nothing in the provision provides for any type of further tolling after the formal denial. Thus, the parties' further discussions and plaintiffs' continual unilateral submissions of additional information and requests to reconsider the denial did not operate, and could not have operated, to rescind defendant's formal denial of liability. The majority's conclusion that a question of fact exists regarding when the formal denial occurred based on events that happened after the formal denial, *which it admits occurred* on June 26, 2003, ignores the statute's plain and unambiguous language in order to avoid the statute's effect.

### IV. THE MAJORITY WRONGLY INVOKES JUDICIAL TOLLING

In support of its position that a question of fact is presented, the majority invokes the doctrine of judicial tolling, thereby enabling litigants to evade the limita-

tions period of MCL 500.2833(1)(q).[7] Litigants may now easily avoid the consequences of a statutorily mandated limitations period. Litigants can simply create "questions of fact" by continually initiating further discussions and submitting the same or additional documentation regarding the claim to insurers even after the claim is formally denied. Our Supreme Court has explicitly rejected these sorts of judicially created tolling mechanisms that are contrary to the plain language of a statute or contract. *Devillers v Auto Club Ins Ass'n*, 473 Mich 562; 702 NW2d 539 (2005); *McDonald v Farm Bureau Ins Co*, 480 Mich 191; 747 NW2d 811 (2008). In doing so, the Court noted, "Statutory . . . language must be enforced according to its plain meaning, and cannot be judicially revised or amended to harmonize with the prevailing policy whims of members of this Court." *Devillers*, 473 Mich at 582. To do so is to "legislate[] from the bench" and to act outside the constitutional authority vested in the courts of this state. *Id*. However, despite the Legislature's clear directive and obvious intent that a claimant must bring his or her claim within one year of a formal denial, the majority's contrary decision amends the statute, eviscerates the Legislature's intent, and fails to honor preexisting law.

---

[7] Ironically, even under the majority's interpretation of MCL 500.2833(1)(q), plaintiffs' claim would still be barred. For example, the limitations period began to run on June 26, 2003, when defendant formally denied the claim, as the majority concedes. Even assuming that the October 10, 2003, meeting resulted in a further tolling of the one-year time limitation, 106 days had already passed during which the period was not tolled. If the period again began to run on October 14, 2003, there only remained 259 days in which to file suit. Thus, even under the majority's reasoning, plaintiffs would still have had to file by June 25, 2004—259 days from October 14, 2003, in order to be timely. Plaintiffs, however, ultimately filed suit in October 2004.

V. THE MAJORITY IMPLICITLY APPLIES EQUITABLE ESTOPPEL

Finally, although it is unclear from the majority's analysis, it appears that it may also be invoking the doctrine of equitable estoppel to justify its desire to toll the limitations period. By doing so, the majority is simply interpreting plaintiffs' actions after the June 26, 2003, denial letter in a way that alleviates the *effect* of the formal denial of liability. "[E]quitable estoppel is a judicially created exception to the general rule that statutes of limitation run without interruption. It is essentially a doctrine of waiver that extends the applicable period for filing a lawsuit by precluding the defendant from raising the statute of limitations as a bar." *Cincinnati Ins Co v Citizens Ins Co*, 454 Mich 263, 270; 562 NW2d 648 (1997). "Equitable estoppel arises where one party has knowingly concealed or falsely represented a material fact, while inducing another's reasonable reliance on that misapprehension, under circumstances where the relying party would suffer prejudice if the representing or concealing party were subsequently to assume a contrary position." *Adams v Detroit*, 232 Mich App 701, 708; 591 NW2d 67 (1998). It requires proof of "conduct clearly designed to induce 'the plaintiff to refrain from bringing action within the period fixed by statute.' " *Lothian v Detroit*, 414 Mich 160, 177; 324 NW2d 9 (1982), quoting *Renackowsky v Detroit Bd of Water Comm'rs*, 122 Mich 613, 616; 81 NW 581 (1900). To invoke the doctrine, the plaintiff must establish three elements: "(1) a false representation or concealment of a material fact, (2) an expectation that the other party will rely on the misconduct, and (3) knowledge of the actual facts on the part of the representing or concealing party." *Cincinnati Ins Co*, 454 Mich at 270. Thus, in the context of insurance claims, the plaintiff must show that the defendant concealed a

cause of action, misrepresented the time in which an action must be brought, or induced the plaintiff to refrain from bringing an action. *Compton v Mich Millers Mut Ins Co*, 150 Mich App 454, 458; 389 NW2d 111 (1986). None of these necessary elements are present here and, thus, the doctrine of estoppel is inapplicable.

### VI. CONCLUSION

To conclude, there is and was no question of material fact that defendant formally denied plaintiffs' claim on June 26, 2003. There is and was no question that defendant did not intend to pay on plaintiffs' claim. Under the plain and unambiguous language of MCL 500.2833(1)(q), an insured must bring his or her claim within one year after the insurer formally denies liability. The trial court erred by denying defendant's motion for summary disposition when there was no dispute on the record that plaintiffs' claim had been formally denied in June 2003 and plaintiffs had not filed their complaint until well after June 2004. The majority's decision compounds this error by reinvigorating the doctrine of judicial tolling that our Supreme Court has explicitly rejected and that will now only serve to invite uncertainty for future litigants.

For these reasons, I dissent and would reverse the judgment of the trial court.