*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MANDI CALDERON, Personal Representative of
the ESTATE OF MANUEL RAMOS-PELAYO, JR.,

　　　　　Plaintiff-Appellant,

v

AAJ HOLDINGS, LLC,

　　　　　Defendant/Third-Party Plaintiff,

and

JOE MANUEL and MY, REALTY SELECT, LLC,

　　　　　Defendants-Appellees,

and

UNITED STATES LIABILITY INSURANCE
COMPANY,

　　　　　Third-Party Defendant.

UNPUBLISHED
April 15, 2025
2:49 PM

No. 366490
Wayne Circuit Court
LC No. 21-001306-NO

MANDI CALDERON, Personal Representative of
the ESTATE OF MANUEL RAMOS-PELAYO, JR.,

　　　　　Plaintiff,

v

AAJ HOLDINGS, LLC,

　　　　　Defendant/Third-Party Plaintiff-
　　　　　Appellee,

Nos. 367445; 367446
Wayne Circuit Court
LC No. 21-001306-NO

-1-

and

JOE MANUEL and MY, REALTY SELECT, LLC,

      Defendants,

and

UNITED STATES LIABILITY INSURANCE
COMPANY,

      Third-Party Defendant-Appellant.

_____

MANDI CALDERON, Personal Representative of
the ESTATE OF MANUEL RAMOS-PELAYO, JR.,

      Plaintiff-Appellant,

v

AAJ HOLDINGS, LLC,

      Defendant/Third-Party Plaintiff-
      Appellee,

and

JOE MANUEL and MY, REALTY SELECT, LLC,

      Defendants-Appellees,

and

UNITED STATES LIABILITY INSURANCE
COMPANY,

      Third-Party Defendant.

No.   368083
Wayne Circuit Court
LC No.   21-001306-NO

_____

Before:  YOUNG, P.J., and O'BRIEN and SWARTZLE, JJ.

PER CURIAM.

In Docket No. 366490,[1] plaintiff, Mandi Calderon, Personal Representative of the Estate of Manuel Ramos-Paleyo, Jr. (decedent), appeals by leave granted[2] (1) the order granting summary disposition in favor of defendants Joe Manuel and My, Realty Select, LLC, under MCR 2.116(C)(8) and (C)(10); and (2) the order denying plaintiff's motion for reconsideration of the order granting summary disposition. In Docket No. 368083, plaintiff appeals as of right the order granting summary disposition in favor of defendant/third-party plaintiff AAJ Holdings, LLC, under MCR 2.116(C)(8) and (C)(10).

In Docket No. 367445, third-party defendant, United States Liability Insurance Company (USLI) appeals as of right the order regarding AAJ Holdings, LLC's second motion for an order of attorney fees against USLI. In Docket No. 367446, USLI appeals by leave granted[3] the same order. In both matters, USLI challenges the trial court's earlier ruling granting AAJ Holdings, LLC's motion for reconsideration and denying USLI's MCR 2.116(C)(10) motion for summary disposition. We affirm in all cases.

I. BACKGROUND

This wrongful-death action arises from the tragic and fatal electrocution of decedent, who was 15 years old, at an industrial warehouse in Detroit, Michigan. The incident happened in May 2020. AAJ Holdings, LLC, owns the warehouse where the incident happened. The warehouse roof contains a raised, brick structure, which is where the incident occurred. There are electrical transmission lines above the raised brick structure, and the lines extend down toward the structure. A sign existed on the structure, which stated, "DANGER 4800 VOLTS." The raised area and the sign appear as follows:

---

[1] This Court consolidated the appeals in Docket Nos. 366490, 367445, 367446, and 368083. *Manuel Ramos-Paleyo, Jr Estate v AAJ Holdings, LLC*, unpublished order of the Court of Appeals, entered October 17, 2023 (Docket Nos. 366490, 367445, 367446, and 368083).

[2] *Manuel Ramos-Paleyo, Jr Estate v AAJ Holdings, LLC*, unpublished order of the Court of Appeals, entered October 10, 2023 (Docket No. 366490).

[3] *Manuel Ramos-Paleyo, Jr Estate v AAJ Holdings, LLC*, unpublished order of the Court of Appeals, entered October 10, 2023 (Docket No. 367446).



Ahmed Aljufairi, who resides overseas, is the sole owner of AAJ Holdings, LLC. Nabih Ayad is AAJ Holdings, LLC's attorney. Ayad was involved in the purchase of the warehouse and serves as the resident agent for AAJ Holdings, LLC. He also assisted Aljufairi with obtaining insurance on, and paying bills for, the warehouse. Michael Radi, who is Aljufairi's family friend, found the warehouse for sale and suggested that Aljufairi purchase it. Aljufairi purchased the property at Radi's recommendation.

After purchasing the property, AAJ Holdings, LLC, obtained insurance coverage for the warehouse through USLI. USLI issued a liability-insurance policy and an excess insurance policy covering the warehouse during the period when the incident happened. The classification listed on the Declarations page for the primary policy was "Vacant Buildings – not factories – Other than Not-For-Profit." Relevant to this matter, the primary policy contained a Classification Limitation endorsement, and exclusions for construction operations and bodily injury on the premises. The parties do not dispute that the coverage under the excess policy mirrors that of the primary policy.

Manuel is a real estate broker working through a company called Weichert Realtors. He also owns My, Realty Select, LLC, but denies using the company to conduct any business since 2016. Manuel maintains that he was, at all relevant times, acting as the broker's agent for AAJ Holdings, LLC, and was assisting the company in finding a buyer for the warehouse when the incident happened. He communicated with Radi (whom he believed was the owner) and Ayad (whom he believed was the property manager). He did not communicate directly with Aljufairi. Manuel put his realtor sign on the front of the building while working to find a buyer.

In early 2020, while Manuel was attempting to sell the property, there were a few break-ins at the property. Manuel came up with a plan to rent the building to deter theft while he was looking for a permanent buyer. Manuel discussed his idea with Ayad. In a text message, he stated, "I have a plan to put a tenant there for free to protect the building and clean it up for us for free." Ayad responded, "That's a good idea!"

In April 2020, a woman named Jill Hofmann called Manuel with interest in leasing the property to temporarily store equipment from a Sears department store liquidation. Manuel and Hofmann met in person at the warehouse. According to Hofmann, they used flashlights when

touring the building, which Manuel told Hofmann was because there was no electricity in the building. Manuel offered Hofmann a three-month rental in exchange for a $6,000 commission. According to Manuel, he discussed the Rental Agreement with Radi. Radi asked Manuel to add language to the Agreement requiring the tenant to secure and clean the building. Otherwise, Radi agreed to the terms.

As discussed later, the executed Rental Agreement stated that the "[T]enant is responsible for all and any repair and maintenance inside the building unit." Manuel's handwritten addition to the Rental Agreement stated, "Tenant must secure entire building and clean building at their own expense." The Rental Agreement referred to a "Landlord," but did not identify the landlord. The Rental Agreement also required Hofmann to indemnify the landlord for any expenses associated with "an injury or any other claim as a result of the Tenant's use and possession of the property." The last page of the Rental Agreement provided that any notices Hofmann wished to send the landlord should be addressed to Manuel's business address. The landlord did not sign the hard copy of the Agreement, although Manuel argues that Radi signed the document electronically.

While Hofmann was renting the building, she believed the Rental Agreement required her to address the frequent break-ins on the property by placing plywood over an access door on the roof. Hofmann had placed a metal ladder inside the warehouse to gain access to the roof. She solicited the help of one of her employees, Cody Penner. Decedent was a family friend of Hofmann. A dispute exists over whether Hofmann asked decedent to help secure the roof. According to Penner and the police report, Hofmann offered to buy decedent a video game if he helped her cut copper on the roof so that it could be moved inside the building. According to Hofmann, decedent merely accompanied her that day to the warehouse.

At some point while he was on the roof, decedent sat down on the raised brick structure. A dispute exists over whether decedent was merely sitting on the structure when the incident happened, or whether he was actively cutting an electrical wire coming down from the overhead lines. Regardless, decedent's shoulder touched an energized power line and caught fire. Penner and Hofmann were unable to get decedent off the structure. They called the police, who arrived at the scene. The police saw that one of the electrical wires was disconnected from the utility pole and was touching decedent. At that point, it appeared decedent was still alive. The police also saw scrap metal in the building and a metal cart bearing a sign stating, "Jill." The police contacted the electric company for the area, DTE Energy, which disconnected the power about an hour later. Decedent was then pronounced dead.

Plaintiff sued AAJ Holdings, LLC, Joe Manuel, and My, Realty Select, LLC, in this wrongful-death action, raising claims for ordinary negligence and premises liability. Hofmann was not named as a defendant in the lawsuit. In their answer, AAJ Holdings, LLC, incorporated a cross-claim against USLI. USLI later became a third-party defendant. The trial court then reassigned the insurance-coverage dispute to a different trial judge (Wayne Circuit Court Judge Muriel Hughes) and assigned the case a business-court (-CB) case code. However, the trial court did not open a separate file for the coverage portion of the case, and all relevant documents continued to be filed in the wrongful-death case.

In the coverage portion of the case, USLI moved for summary disposition of AAJ Holdings, LLC's claims under MCR 2.116(C)(10). USLI argued that coverage did not exist

because the warehouse was not vacant after Hofmann became a tenant, and because coverage was barred under the Construction Operations and Bodily Injury Exclusions in the primary policy. The parties disputed, for purposes of summary disposition, whether the Rental Agreement was valid. The trial court initially agreed with USLI's arguments and granted USLI's motion for summary disposition. However, after AAJ Holdings, LLC, moved for reconsideration and attached evidence supporting that the Rental Agreement was invalid, the trial court denied the motion for summary disposition. The court also ordered USLI to defend AAJ Holdings, LLC, in the wrongful-death action (although unclear from the record, it appears the court granted summary disposition to AAJ Holdings, LLC, under MCR 2.116(I)(2)). After the trial court awarded fees and costs, USLI appealed in Docket Nos. 367445 and 367446.

Meanwhile, in the wrongful-death case, Manuel and My, Realty Select, LLC, moved for summary disposition following discovery. They argued, in relevant part, that Manuel did not own, possess, or control the warehouse, and My, Realty Select, LLC, was not involved with the warehouse. Furthermore, neither defendant had notice of the dangerous condition. Finally, they argued, under then-existing caselaw, that they owed no duty of care because the dangerous condition was open and obvious. Plaintiff responded that myriad factual disputes existed on possession, control, and notice, which should preclude summary disposition.

The trial court, Wayne Circuit Court Judge Leslie Kim Smith presiding, granted the motion for summary disposition, concluding that Hofmann had sole possession over the property. After discussing the conflicting evidence on Radi's role in AAJ Holdings, LLC, the court concluded Radi had "some authority" for the company. The court also found that decedent was engaged in an adult activity when he died, and that the average 15-year-old engaged in an adult activity would appreciate the danger posed by the power lines. Thus, Manuel and My, Realty Select, LLC, did not have a duty toward decedent because the dangerous condition was open and obvious. As noted earlier, after the court denied reconsideration, plaintiff appealed by leave granted in Docket No. 366490.

AAJ Holdings, LLC, also moved for summary disposition, arguing in relevant part that the Rental Agreement did not require AAJ Holdings, LLC, to maintain control over the property or to repair it. Manuel leased the property and obtained a commission, and Hofmann was responsible for repairs and maintenance. Plaintiff responded that a factual dispute existed over whether Manuel was acting as the agent of AAJ Holdings, LLC, and whether AAJ Holdings, LLC, retained possession and control through the terms of the Rental Agreement. Further, plaintiff argued that the condition was highly dangerous and therefore fell under one of the two "special aspects" exceptions to the open and obvious danger doctrine. The trial court ruled, in relevant part, that Hofmann had sole control over the property and a duty to indemnify the landlord. Therefore, AAJ Holdings, LLC, had no control or possession over the property and the trial court granted summary disposition for AAJ. Plaintiff appealed that order in Docket No. 368083.[4]

---

[4] The trial court dismissed plaintiff's negligence claims, finding that her claims sounded in premises liability. Plaintiff does not challenge the trial court's ruling on appeal, and we do not address it further.

## II. DOCKET NOS. 366490 AND 368083

Plaintiff argues, in Docket Nos. 366490 and 368083, that the trial court erred by failing to recognize that factual disputes existed regarding whether any of the defendants possessed or controlled the warehouse. We disagree and affirm the trial court as to all defendants.

### A. STANDARDS OF REVIEW

We review de novo a trial court's decision on a motion for summary disposition. *Holder v Anchor Bay Investments, Inc*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 364401); slip op at 2. Defendants moved for summary disposition under MCR 2.116(C)(8) and (C)(10). While it is not entirely clear which portions of defendants' motions for summary disposition were filed under MCR 2.116(C)(8) and which portions were filed under MCR 2.116(C)(10), for each issue raised on appeal, defendants cited to exhibits from the record, and the trial court relied on evidence when ruling in favor of defendants. "Where a motion for summary disposition is brought under both MCR 2.116(C)(8) and (C)(10), but the parties and the trial court relied on matters outside the pleadings, as is the case here, MCR 2.116(C)(10) is the appropriate basis for review." *Silberstein v Pro-Golf of America, Inc*, 278 Mich App 446, 457; 750 NW2d 615 (2008). Therefore, we review the issue under MCR 2.116(C)(10).

A motion for summary disposition under MCR 2.116(C)(10) examines the factual sufficiency of the complaint. *Holder*, ___ Mich App at ___; slip op at 2. The court will consider the evidence submitted by the parties in the light most favorable to the nonmovant, and when the evidence does not establish a genuine issue on any material fact, the party moving for summary disposition is entitled to judgment as a matter of law. *Id*. at ___; slip op at 2. "[T]he moving party has the initial burden of supporting its position by affidavits, depositions, admissions, or other documentary evidence. The burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists." *Id*. at ___; slip op at 2 (quotation marks and citation omitted).

We review the trial court's decision on a motion for reconsideration for an abuse of discretion. *Woods v SLB Prop Mgt, LLC*, 277 Mich App 622, 629; 750 NW2d 228 (2008). An abuse of discretion occurs when the trial court's ruling falls outside the range of reasonable and principled outcomes. *AFP Specialties, Inc v Vereyken*, 303 Mich App 497, 517; 844 NW2d 470 (2014). A trial court abuses its discretion when it commits a legal error. *Masrur v Regents of the Univ of Mich*, 344 Mich App 102, 110; 999 NW2d 55 (2022). MCR 2.119(F)(3) requires a party moving for reconsideration to demonstrate a palpable error by which the court and the parties were misled, and to demonstrate that a different disposition would result from correction of the error. A motion for reconsideration merely presenting the same issues will generally not be granted. *Id*. Finally, we review questions of contractual interpretation and statutory interpretation de novo. *Innovation Ventures v Liquid Mfg, LLC*, 499 Mich 491, 507; 885 NW2d 861 (2016); *Holder*, ___ Mich App at ___; slip op at 2.

The elements of premises liability are the same as in any negligence action: "[D]uty, breach, causation, and harm." *Kandil-Elsayed v F & E Oil, Inc*, 512 Mich 95, 110; 1 NW2d 44 (2023). "Land possessors owe a duty 'to exercise reasonable care to protect invitees from an unreasonable risk of harm caused by a dangerous condition of the land.'" *Id*. at 112 (citation omitted).

Premises liability also requires the defendant to have both possession and control over the property. *Gabrielson v Woods Condo Ass'n, Inc*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket Nos. 364809 and 364813); slip op at 9. The idea is that the party who has possession of the property is in the best position to protect others from harm. *Janini v London Townhouses Condo Ass'n*, ___ Mich ___, ___; ___ NW3d ___ (2024) (Docket No. 164158); slip op at 10. The concept of possession is not about a theoretical right to possess the property, but rather, depends on the individual's actual exercise of control and dominion. *Derbabian v S & C Snowplowing, Inc*, 249 Mich App 695, 704; 644 NW2d 779 (2002). "Who had possession and control of a piece of property at a given time presents a question for the jury to decide unless there is no dispute of material fact." *Gabrielson*, ___ Mich App at ___; slip op at 9. The term "possession" means " 'the right under which one may exercise control over something to the *exclusion of all others*.' " *Id*. at ___; slip op at 9 (citation omitted). The term "control" is defined as "the ability to exercise direction over; dominate, regulate, or command." *Id*. at ___; slip op at 9 (quotation marks and citation omitted). "Title ownership is not dispositive of the question who has possession and control of the property." *Id*. at ___; slip op at 9. In fact, the right of possession can be "loaned" to another person or entity. *Id*. at ___; slip op at 9 (quotation marks omitted). Therefore, two or more people or entities can share possession and control over the property and can have "coextensive duties" to those who enter the land. *Id*. at ___; slip op at 9-10.

## B. DEFENDANT AAJ HOLDINGS, LLC AND THE ROLE OF THE RENTAL AGREEMENT

This case involves the rental of a commercial building. The general rule is that when a landlord executes a lease with a tenant, unless there is an agreement to the contrary, the landlord relinquishes control over the leased area to the tenant and retains a mere reversionary interest in the property. *Bailey v Schaaf*, 494 Mich 595, 609 n 36; 835 NW2d 413 (2013). "This relinquishment of control extinguishes the landlord's duty of reasonable care over those areas." *Id*. In other words, "[t]he landlord is not liable for injuries that occur within the boundaries of the leased premises." *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495, 499 n 10; 418 NW2d 381 (1988). Thus, without "a contract duty on the part of the owner or landlord, the tenant . . . is bound to keep the leased premises in repair [and] the owner is not liable for damages to third persons for injuries arising from the neglect of the tenant to repair." *Sholberg v Truman*, 496 Mich 1, 10; 852 NW2d 89 (2014) (quotation marks and citation omitted; alteration in original).

The Rental Agreement did not require the landlord (who was unidentified) to maintain or repair the premises during the period of occupancy. Instead, Hofmann was the party who was solely in charge of maintaining the premises. Plaintiff argues that the Rental Agreement required Hofmann to repair and maintain only the inside of the warehouse. Yet the language of the Agreement was broad. The Rental Agreement provided, in relevant part, that "[a]ll building repair and maintenance inside and outside [was] be paid by Tenant, [and] tenant is responsible for all and any repair and maintenance inside the building." Manuel's handwritten addition to the Agreement stated, "Tenant must secure entire building and clean building at their own expense." The tenant also agreed to indemnify the landlord for any expenses, costs, and legal fees for an injury resulting from the tenant's use and possession of the property. There was no language limiting the tenant's obligations or indemnification of the landlord to the inside of the warehouse. There was some language at the end of the agreement holding the landlord responsible for some maintenance, but it ultimately "release[d] the landlord of its obligations . . . and from any claim for injury." In

-8-

addition, the landlord had to provide notice under all circumstances other than in the case of an emergency to enter the leased property. Under these circumstances, regardless of which party was the landlord, the landlord did not retain possession and control under the terms of the Rental Agreement.

Plaintiff also relies on several statutes to support her position that the landlord had a legal duty to keep the premises safe. Even assuming the Rental Agreement did not disclaim those obligations, they do not apply in this context.

First, plaintiff cites certain sections of the Stille-DeRossett-Hale Single State Construction Code Act, MCL 125.1501 *et seq.*, which require the promulgation of a state construction code to, among other things, ensure adequate building maintenance and to protect the health, safety, and welfare of the public. See MCL 125.1504(1) and (3)(e). However, the statute is silent on the issue of a landlord's duties owed to a tenant in a commercial lease or to third parties on the land. Therefore, the statute does not apply to the warehouse at issue.

Second, plaintiff cites MCL 125.538 and MCL 125.539, two sections of the Housing Law of Michigan (HLM), MCL 125.401 *et seq.*, to support her argument that a landlord cannot maintain a "dangerous building."[5] MCL 125.538 provides, "It is unlawful for any owner or agent thereof to keep or maintain any dwelling or part thereof which is a dangerous building as defined in [MCL 125.539]." MCL 125.539 defines a "dangerous building" as a building that, in relevant part, has one of the two following conditions: (1) "[a] part of the building or structure is likely to fall, become detached or dislodged, or collapse and injure persons or damage property[;]" or (2) "[t]he building, structure, or a part of the building or structure is manifestly unsafe for the purpose for which it is used." MCL 125.539(c) and (f).

Plaintiff does not address whether the HLM can apply to claims of third parties to the contract, such as decedent, or whether the HLM can establish a duty forming the basis of a premises-liability claim. However, even assuming the HLM applies in this context, the HLM applies to "dwellings," which the HLM defines as "any house, building, structure, tent, shelter, trailer or vehicle, or portion thereof, . . . which is occupied in whole or in part as the home, residence, living or sleeping place of 1 or more human beings, either permanently or transiently." MCL 125.401(3) and MCL 125.402(1). This case involves a commercial warehouse, not a residential property. Therefore, the HLM does not apply to the warehouse at issue.

Plaintiff also suggests that MCL 554.139, a law relating to the lease of residential premises, applies in this case. Like the HLM, however, MCL 554.139 only applies in the context of a "residential premises." See MCL 554.139(1) (noting that the requirements placed on the lessor apply in the case of a lease of a "residential premises"). The same is true of MCL 554.633(1)(a)

---

[5] We recognize that plaintiff did not raise an argument under these statutes in the trial court. However, we overlook the preservation standard for purposes of this issue because "the issue involves a question of law and the facts necessary for its resolution have been presented." See *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, 347 Mich App 280, 290; 14 NW3d 472 (2023).

and (1)(e), which provide that (1) a rental agreement may not contain a provision waiving or altering a remedy available to the parties when the premises violate MCL 554.139, which again applies only to residential premises; and (2) the rental agreement may not contain a provision that "[e]xculpates the lessor from liability for the lessor's failure to perform, or negligent performance of, a duty imposed by law." See also MCL 554.632(a) (defining a "rental agreement" as, in relevant part, "a written agreement embodying the terms and conditions concerning the use and occupancy of *residential premises*") (emphasis added).

As a result, *if* the lease agreement is valid, then the trial court properly granted summary disposition for AAJ Holdings, LLC and its agents. But, herein lies the factual question—is the lease agreement valid? The parties have resolved this question for us by conceding that it is. To be clear, AAJ Holdings, LLC has expressly argued in the business court insurance priority case that the lease is *not* valid. However, in the context of the wrongful death appeal, the parties affirmatively state that the lease *is* valid. As a result, the parties have waived this issue. Given that the parties do not contest the validity of the lease, and the lease relinquished control of the property to Hofmann, we affirm the trial court.

## C. MANUEL AND MY, REALTY SELECT, LLC

Whether or not the rental agreement is valid, Manuel and My, Realty Select, LLC did not have possession or control of the warehouse.

Manuel was the real estate broker for the warehouse. In *Anderson v Wiegand*, 223 Mich App 549, 551-552; 567 NW2d 452 (1997), this Court addressed a real-estate agent's possession of property in a case where the plaintiff fell on a walkway covered in ice while attending an open house for the defendant-owners' property. At the time, the owners' real-estate agent (who was also a defendant) had a key to the property but did not see any ice on the walkway until after the plaintiff fell. *Id*. On appeal of a grant of summary disposition in the defendants' favor, this Court held that the owners had ceded control of the property to the real-estate agent for purposes of conducting the open house. *Id*. at 553, 556. So. the owners were not liable to the plaintiff, but factual disputes existed over whether the realtor took reasonable steps to address the dangerous condition on the property. *Id*. at 556-558. Decedent's injuries in this case did not occur during an open house or a showing of the warehouse. Nor was Manuel on the property at the time of the incident. Thus, we do not find this caselaw applicable here.

The facts also do not support possession and control. Although Manuel received $6,000 from Hofmann as part of the rental, this amount served as his commission on the sale. Plaintiff points out that Manuel was "the point of contact" for interested buyers and would communicate with Radi and Ayad about the property. However, plaintiff cites no caselaw that would support that an agent's communications with the owner about the property establish an element of possession or control over the property. Similarly, the fact that Manuel suggested that AAJ Holdings, LLC, rent the warehouse did not show the ability to exercise direction over, dominate, regulate, or command the property, or the ability to exercise control over the warehouse to the exclusion of all others.

The fact that Manuel prepared the Rental Agreement and later made handwritten changes to the Agreement does not show that he had any ability to exercise direction over, dominate,

command, or regulate the warehouse. Nor does the fact that his business address was the notice address for the landlord establish possession or control. Moreover, the fact that Manuel gave Hofmann two keys to the front entrance of the warehouse, considered alone, also does not establish possession or control. It is unclear from the record how long Manuel had the keys, and there is no evidence that AAJ Holdings, LLC, allowed Manuel to use the keys for anything other than handing them to Hofmann for the period of her rental. Finally, the presence of Manuel's real estate sign on the property did not establish that he had any possession or control.

Instead, Hofmann was exercising sole possession and control during the incident. Hofmann testified that she understood that she had possession of the building and was responsible for the building after signing the Rental Agreement. She acknowledged during her second deposition that she brought decedent to the roof using her personal ladder, and allowed him to climb onto the raised portion of the roof. Considering these facts, the trial court did not err by concluding that Manuel did not have possession or control over the property at the time of the incident.

Regarding My, Realty Select, LLC, plaintiff argues that a factual dispute exists about whether this entity possessed or controlled the warehouse because (1) a Google search indicated that the address at which Hofmann was required to provide notice to the landlord was associated with My, Realty Select, LLC; and (2) Manuel used an e-mail address associated with My, Realty Select, LLC, when communicating with Radi and Ayad about the warehouse. Had evidence existed that Manuel was possessing or controlling the property, then a factual dispute may have existed regarding My, Realty Select, LLC's role. However, because there is no evidence that Manuel possessed or controlled the warehouse, there can be no factual dispute on whether My, Realty Select, LLC, possessed or controlled the property.

### III. DOCKET NOS. 367445 AND 367446

In Docket Nos. 367445 and 367446, USLI argues the trial court erred by granting AAJ Holdings, LLC's motion for reconsideration, denying USLI's motion for summary disposition, and ordering USLI to defend AAJ Holdings, LLC, in the wrongful-death portion of the case. We disagree.

Analysis of an insurance policy usually involves a two-step inquiry: (1) whether the insurance policy provides coverage, and (2) whether an exclusion applies to negate coverage. *Duato v Mellon*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 362823); slip op at 4. The insured bears the burden to establish coverage, while the insurer must prove that an exclusion applies. *Id.* at ___; slip op at 4. An insurance company must defend its insured when "the allegations of the underlying suit arguably fall within the coverage of the policy." *Citizens Ins Co v Secura Ins*, 279 Mich App 69, 74; 755 NW2d 563 (2008) (quotation marks and citation omitted). The basis for the duty to defend arises from the contractual language. *Id.* The duty to defend is broader than the duty to indemnify. *American Bumper & Mfg Co v Hartford Fire Ins Co*, 452 Mich 440, 450-451; 550 NW2d 475 (1996). While policy exclusions are to be strictly construed against the insurer, exclusions that are clear and specific will be enforced as written. *Duato*, ___ Mich App at ___; slip op at 4.

## A. VACANCY CONDITION

The first question is whether the warehouse was a vacant building covered under the insurance policies.  Relevant to this issue is whether the meaning of the term "vacant" depends on whether the Rental Agreement was valid.  The insurance policies in question covered a vacant building.  The Classification Limitation endorsement in the primary policy provided, in relevant part:

> Coverage under this contract is strictly limited to the classification(s) and code(s) listed on the policy Declarations page.
>
> No coverage is provided for any classification(s) and code(s) not specifically listed on the Declarations page of this policy.

Included on the Declarations page is the classification "Vacant Buildings - not factories – Other than Not-For-Profit."  The Classification Limitations Endorsement and the Declarations page did not differentiate between vacant and partially vacant buildings, or between vacant and unoccupied buildings.

The parties dispute the meaning of the term vacant.  This Court has previously looked to a dictionary definition of vacant, which is " 'empty; unoccupied.' "  *Vushaj v Farm Bureau Gen Ins Co of Mich*, 284 Mich App 513, 515; 773 NW2d 758 (2009), quoting *Black's Law Dictionary* (8th ed).  The policy in *Vushaj* provided, in relevant part, that "a policy holder is not entitled to coverage for any loss that occurs 'while a described building, whether intended for occupancy by owner or tenant, is vacant or unoccupied beyond a period of 30 consecutive days.' "  *Id*. at 516.

The *Vushaj* Court noted that sometimes the terms vacant and unoccupied can be distinguished from each other.  *Id*. at 515-516.  However, because the insurance contract in that case did not distinguish between a vacant property and an unoccupied property, this Court rejected the premise that the building must be "wholly empty" for the vacancy provision to take effect.  *Id*. at 516.  This Court recognized that absurdity could result from an alternative interpretation, reasoning, "[f]or example, a fully furnished house would never be considered to be vacant, even if no person entered the house for years, simply because the furniture in the house prevented the structure from being 'completely empty.' "  *Id*.  Therefore, this Court held that the term vacant meant "not routinely characterized by the presence of human beings."  *Id*. (quotation marks omitted).

In *McNeel v Farm Bureau Gen Ins Co of Mich*, 289 Mich App 76, 91; 795 NW2d 205 (2010), the policy in question distinguished between the terms vacant and unoccupied.  This Court defined the term vacant to mean " '[h]olding nothing: empty.' "  *Id*. at 91, quoting *Webster's New Basic Dictionary* (2007).  This Court also defined the term "unoccupied" as "not lived in."  *McNeel*, 289 Mich App at 91.  Thus, " '*vacant* means without inanimate objects, while *unoccupied* means without human occupants.' "  *Id*. at 92 (citation omitted).

The policy in question here does not distinguish between a vacant property and an unoccupied property.  For this reason, the definition of vacant in *Vushaj* is more appropriate than

the *McNeel* definition.  Thus, under *Vushaj*, to be considered vacant, the property must not be routinely characterized by the presence of human beings.  See *Vushaj*, 284 Mich App at 516.

The issue of whether the building was vacant involves a factual dispute.  Questions of fact existed on how often Hofmann was on the site and what activities she was performing.  On the one hand, there is little in the record to suggest that the building was "*routinely* characterized" by the presence of Hoffman, decedent, or anyone else.  We reject USLI counsel's assertion at oral argument that the mere fleeting presence of a person in the building somehow vitiates coverage under this policy.  On the other hand, there is also evidence in the record to suggest a more regular presence of people.  The investigation report contained numerous photographs, taken by Manuel, showing items within the warehouse.  The photographs include a photograph of the metal ladder to the roof and the cart with the attached sign stating "Jill."  The photographs support that someone was present in the warehouse to place all the items inside.  USLI also attached the Rental Agreement, which supported USLI's position that Hofmann was renting the property and therefore the property was occupied.[6]  However, the validity of that Rental Agreement is itself an unanswered question.  Additionally, while the building was deemed abandoned or condemned on the police report, the police saw a rental truck outside of the warehouse, which contained scrap metal.  They saw a cart containing scrap metal.  They also saw numerous tools inside a cardboard box.  And sure, this does not indicate occupancy as in "living there" or daily occupancy, but it does suggest the possibility of intentional occupancy in the context of the building it was—a warehouse/storage unit.  Therefore, whether the property was vacant presents a close factual question.[7]

## B.  POLICY EXCLUSIONS

The next issue is whether the policy exclusions barred coverage.  Regarding the Construction Operations Exclusion, the policy provided, in relevant part:

> This policy does not insure against loss or expense, including but not limited to the cost of defense, arising or resulting, directly or indirectly from "bodily injury", "property damage", or "personal and advertising injury" or medical

---

[6] USLI has not provided a legal basis for expanding the summary disposition record on appeal to include the documents that were before Judge Smith in the wrongful-death portion of the case.  Therefore, we limit our review to the documents before the trial court on USLI's motion for summary disposition.

[7] Judicial estoppel does not apply here.  Judicial estoppel is an equitable doctrine preventing a party from taking a position in one phase of the case, prevailing on that position, and then relying on a contradictory position in another phase of the case.  *Spohn v Van Dyke Pub Schs*, 296 Mich App 470, 479; 822 NW2d 239 (2012).  The party must have "successfully and unequivocally asserted a position in a prior proceeding."  *Id*. (quotation marks and citation omitted; emphasis omitted).  The positions must also be " 'wholly inconsistent.' "  *Id*. (citation omitted).  USLI did *not* argue for purposes of summary disposition that the meaning of the term vacant hinged on whether the lease was valid.  So the positions were not wholly inconsistent.

-13-

expenses arising out of any construction, "construction services", demolition, renovation, structural repairs, site preparations or similar operations.

A genuine issue of material fact existed on whether there were construction operations occurring on the premises. If decedent was engaged in illegal scrapping operations at the time of the incident, then decedent was not engaged in construction services, renovation, or demolition of the warehouse, as contemplated under this exclusion. Rather, he would have been damaging the property illegally. On the other hand, if decedent was helping to secure the building, then arguably he was engaged in construction, renovation, or structural repairs.

The Bodily Injury Exclusion is a closer question because of the broad application of this exclusion. The Bodily Injury Exclusion barred coverage for:

> "[b]odily injury" to any "Contractor", "Subcontractor" or any "employee", "volunteer worker", "temporary worker" or "casual laborer" of any "Contractor" or "Subcontractor", whether or not under contract with any insured or additional insured, arising out of or relating, directly or indirectly, to providing or failing to provide work, materials or services of any kind or nature whatsoever by such "Contractor", "Subcontractor" or "employee", "volunteer worker", "temporary worker" or "casual laborer" of such "Contractor" or "Subcontractor" for which "bodily injury" any insured or additional insured may become liable in any capacity[.]

The policy contained a broad definition of the terms "Contractor" and "Subcontractor," defining both terms as "any person who provides work, materials or services of any kind, to any person, entity or organization with or without a contract." This exclusion does not have an exception for illegal activities. There was evidence in the police report that decedent was working to remove scrap metal from the warehouse roof when he was injured. Therefore, this exclusion would arguably apply to bar coverage in this case simply because decedent was on the roof and the evidence supported he was performing work. However, questions of fact exist on the issue considering that it was unclear from the position of decedent's body whether he was working before the incident and considering that the exclusion should be construed strictly in favor of AAJ Holdings, LLC. See *Duato*, ___ Mich App at ___; slip op at 4.

Questions of fact existed on what precisely Hofmann and decedent were doing when the incident happened and as to whether the warehouse was vacant. Questions of fact are typically an indication that summary disposition is improper but here, we emphasize that the court must resolve any doubts in favor of coverage. The trial court properly did so. Because the insurer's duty to defend is broader than the duty to indemnify, and incorporates any situation in which there is arguably coverage, the trial court did not err by ruling that USLI must defend AAJ Holdings, LLC, in this lawsuit.

## IV. CONCLUSION

In Docket No. 366490, we affirm the order granting summary disposition in favor of defendants Joe Manuel and My, Realty Select, LLC, under MCR 2.116 (C)(10); and (2) the order denying plaintiff's motion for reconsideration of the order granting summary disposition. In

-14-

Docket No. 368083, we affirm the order granting summary disposition in favor of defendant/third-party plaintiff AAJ Holdings, LLC, under MCR 2.116 (C)(10).

In Docket No. 367445 and 367446, we affirm the trial court's earlier ruling granting AAJ Holdings, LLC's motion for reconsideration and denying USLI's motion for summary disposition under MCR 2.116(C)(10).

/s/ Adrienne N. Young
/s/ Colleen A. O'Brien
/s/ Brock A. Swartzle